NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

HOWELL AUTOMATIC MACHINE COMPANY, Respondent.

No. 71-1246.

United States Court of Appeals, Sixth Circuit.

Feb. 3, 1972.

Stuart M. Rosenblum, N. L. R. B., Washington, D. C., Eugene G. Goslee, Acting Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Charles M. Steele, Atty., N. L. R. B., Washington, D. C., on brief for petitioner.

Paul Walter, Cleveland, Ohio, Walter, Haverfield, Buescher & Chockley, John J. Kelley, Jr., Michael T. McMenamin, Cleveland, Ohio, on brief, for respondent.

Before CELEBREZZE, BROOKS*, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

CELEBREZZE, Circuit Judge.

This is a petition for enforcement of an order of the National Labor Relations Board, reported at 183 N.L.R.B. #134. The Board found that the Respondent Company had violated § 8(a) (3) and 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (3) and (a) (1) [1] by discharging employee Marlene Fenske on August 8, 1969. It ordered the reinstatement of the employee with back pay from the date of the discharge.

The Howell Automatic Machine Company (the Company) manufactures and sells screw machine parts. Its only plant is located in Strongsville, Ohio. The business is owned by two brothers, Robert and Norman Pennock. Robert Pennock serves as president of the Company and Norman as secretary-treasurer.

In August, 1968 District 54 of the International Association of Machinists & Aerospace Workers (the Union) began a campaign to organize the Company's workers. A December 1968 election, which resulted in defeat for the Union was set aside because of the failure of the Company to provide the addresses of its employees.[2] A rerun election was

---

* This case was argued to a panel consisting of Judges Celebrezze, Brooks and O'Sullivan. Judge Brooks died before a decision was reached or an opinion prepared.

1. Section 158:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   (3) by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization. . . .

2. The Company's failure to supply such addresses was based on the First Circuit's decision in Wyman-Gordon v. N.L.R.B., 397 F.2d 394. When the Supreme Court reversed the Court of Appeals (N.L.R.B. v. Wyman-Gordon, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), the Company voluntarily complied with a request for addresses. Thus we do not believe

held in July, 1969 and the Union lost by a single vote in a unit substantially reduced by economic layoffs.

█ Marlene Fenske was hired by the Company in July, 1967. It was undisputed at the hearing held on this present complaint that Mrs. Fenske had been active in the Union organizational effort in the period preceeding the December, 1968 election; she passed out membership cards, union literature and publicly extolled the virtues of union membership. Mrs. Fenske and several other witnesses testified at the hearing that management was aware of her union activities. The Company President, Robert Pennock testified that he did not know of Mrs. Fenske's organizational efforts. The Trial Examiner credited Mrs. Fenske and her supporting witnesses on this point and the Board agreed with this position. It is within the special province of the Examiner to settle questions of credibility, N.L.R.B. v. Stemun Mfg. Co., 423 F.2d 737, 739 (6th Cir.1970), and we will not ordinarily disturb findings made by the Examiner who has had the opportunity to observe the demeanor of the witnesses. We accept Mrs. Fenske's testimony and that of other witnesses called on behalf of the General Counsel as establishing the fact that management in general and President Pennock in specific had knowledge of Mrs. Fenske's union activities at all times relevant to the discharge in question.

There is no evidence at all suggesting that Mrs. Fenske performed any organizing role or otherwise aided the Union in the period after the December election, however. She did not campaign for the Union prior to the July election and did not herself vote in that election, having been hospitalized for performance of an emergency appendectomy on June 28, 1969.

As a result of the appendectomy Mrs. Fenske was unable to work for a period of approximately six weeks. On August 6th, Mrs. Fenske telephoned the Company's offices and spoke with Treasurer Norman Pennock who gave her permission to begin her vacation period at that time. Her request and his agreement were predicated on the fact that Mrs. Fenske's benefits under the Company's group disability insurance program had not yet been paid by the insurer and Mrs. Fenske was in need of both the additional recovery time and immediate cash which the vacation arrangements could provide. She agreed that she would return to work by August 18th.

Representatives of the insurance company contacted her the next day and told her that her claim could be processed more quickly if she brought her hospital bill directly to her employer. She agreed to do so and on that same day, August 7th paid a visit to the Company offices. She gave the payroll clerk, Marge Hopkins, the hospital bill; she also asked if she could be given her vacation check at that time to avoid another trip. The clerk made inquiries and then told Mrs. Fenske that the check had not yet been signed by Norman Pennock. Mrs. Fenske, according to her own testimony, replied: "He didn't sign it? Don't tell me that because they get paid on Thursday here at the shop for the night shift."

Mrs. Fenske then left the plant. The payroll clerk repeated the remarks to Robert Pennock; according to Pennock [3] she also told him that Mrs. Fenske had said that her treatment "was what she would have expected out of a place like Howell."

The next day, August 8th, Mrs. Fenske returned to pick up her vacation money. She received the check but noticed a $15.48 deduction for insurance

that the initial failure to supply the information requested itself suggests a bad faith effort to thwart the organizational goals of the Union.

3. Mrs. Hopkins was not called to testify at the hearing by either party; she had

left the Company several weeks before the hearing and was under a doctor's care at the time of that hearing according to Robert Pennock's testimony.

premiums. Not understanding the reason for the deduction she approached her supervisor for an explanation, but he too was unable to account for the deduction. On his suggestion Mrs. Fenske placed an intraoffice call to payroll clerk Hopkins who explained that the Company continued to pay insurance premiums for only four weeks of an employees' illness and that thereafter the employee had to bear the costs herself. The deduction, according to Mrs. Hopkins, represented two weeks premiums.

Mrs. Fenske testified that she informed Hopkins that the "$15.48 was steep for only two weeks, and I had not received any money so far from the insurance company, and I thought it was a stupid operation." According to President Pennock, Mrs. Hopkins reported the above quoted remarks to him and also stated that Mrs. Fenske had called Howell "a lousy place to work."

Upon having this account of Mrs. Fenske's comments related to him, Pennock rushed from his office and, without questioning Mrs. Fenske as to the accuracy of the payroll clerk's account of the conversation, announced that "he had let the statement go from the day before, but he would not let the statement [Mrs. Fenske] just made go by; he did not need [her] kind of people in his shop and [Mrs. Fenske] could just get out and stay out." He cut off her attempt at explanation and turned his back upon her. When, a few minutes later, he found her talking to employees in a tool shed, he told her to "get off the property" and "keep on going."

■ A non-unionized employer may, in the absence of a contract, "discharge [an] employee for good cause, bad cause, or no cause at all." Portable Electric Tools, Inc. v. N.L.R.B., 309 F.2d 423 (7th Cir.1962). If, however, "the real motive for the firing is discrimination against [an employee] because of his union activities or affiliations there is a violation of the Act, N. L. R. B. v. Challenge-Cook Brothers of Ohio, Inc., 374 F.2d 147, 152 (6th Cir.1967).

■ The question as to the Company's motivation in firing is a factual one to be determined primarily by the Trial Examiner and the Board, N.L.R.B. v. Murray Ohio Mfg. Co., 358 F.2d 948, 950 (6th Cir.1966). Such determination is subject to review in this Court limited to the question of whether or not it is supported by substantial evidence on the record as a whole. See N.L.R.B. v. Ogle Protection Service, Inc., 375 F.2d 497, 505 (6th Cir.1967), cert. denied 389 U.S. 843, 88 S.Ct. 84, 19 L.Ed.2d 108 (1967); N. L. R. B. v. Murray-Ohio, supra, 358 F.2d at 950; cf. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); 29 U.S.C. § 160(e).

■■ The burden of proving that a discriminatory or anti-union motive impelled the employer to act lies with the General Counsel. N.L.R.B. v. Bangor Plastics, Inc., 392 F.2d 772, 777 (6th Cir.1967); Lawson Milk Company v. N.L.R.B., 317 F.2d 756, 760 (6th Cir. 1963). The Trial Examiner found and the Board, in adopting the Examiner's recommendations, agreed that General Counsel had successfully shouldered that burden here and demonstrated that Mrs. Fenske's remarks were merely a pretext used by Company President Pennock who looked upon the outbursts as an opportunity to fulfill his long standing desire to discharge a dedicated union supporter and organizer. We are unable to agree that substantial evidence on the record as a whole supports this finding.

The Trial Examiner based his conclusion substantially on two things: a conversation between a co-worker of Mrs. Fenske and the Company President, in which the latter expressed a desire "to get rid of Mrs. Fenske" because of the trouble she had caused and the "sudden and arbitrary" nature of the discharge itself.

Examined in the perspective of all the evidence, including the body of evidence opposed to the Board's view, (Universal Camera, supra, 340 U.S. at 488, 71 S.Ct. 456) the base upon which the Examiner's

conclusion and that of the Board rests is insubstantial.

The conversation between employee Harriet Bert and President Pennock in which the subject of Mrs. Fenske's discharge was discussed occurred in December, 1968 immediately after the first election. According to her testimony, Mrs. Bert (then a union opponent) congratulated Pennock on his victory and added: "Why don't you get rid of Marlene (Fenske) now she has caused all this trouble." Pennock allegedly replied: "Yes, I know, but I can't get rid of her now because the National Labor Relations Board would back her up. One way or the other I will get rid of her." Pennock did not recall any such conversation. This coupled with the fact that Mrs. Bert admitted being a close friend and neighbor of Mrs. Fenske at the time of the hearing raises a question of credibility as to her uncorroborated testimony. The Trial Examiner resolved the question in favor of Mrs. Bert. Again, this is a judgment this Court cannot question except in the most extraordinary circumstances—circumstances absent here. See N.L.R.B. v. Elias Brothers Big Boy, Inc., 327 F.2d 421 (6th Cir. 1964); N.L.R.B. v. Stemun Mfg. Co., 423 F.2d 737 (6th Cir.1970).

Mrs. Bert's testimony referred to a conversation occurring some eight months before the contested discharge. There is no evidence in the record that Mrs. Fenske engaged in any organizational activities during the interval although an election was planned and held. During that interval the Company laid off more than two thirds of its work force—over 100 workers—but Mrs. Fenske was retained despite Pennock's alleged intent "to get rid of her." Given these facts it is evident that the conversation above is not itself substantial evidence of anti-union motivation with regard to Mrs. Fenske's discharge.

Recognizing this, the Trial Examiner placed great reliance on the circumstances of the discharge itself in finding that an anti-union attitude was a factor in Mrs. Fenske's firing.

The Examiner's discussion focuses on the "mildness" of the remarks made by Mrs. Fenske. The thrust of his decision is that he would not have found such remarks grounds for discharge if he were the employer, that Pennock therefore could not have found the remarks to constitute such grounds and that Pennock's decision to fire Mrs. Fenske must therefore have been motivated in part by an anti-union attitude. Whether the remarks were objectively so offensive, however, is not the relevant question, for the Board and its examiners "cannot substitute [their] judgment for that of the employer" in making hiring or firing decisions. N.L.R.B. v. Ogle Protection Service, Inc., 375 F.2d 497 (6th Cir.1967), cert. denied 389 U.S. 843, 88 S.Ct. 84, 19 L.Ed.2d 108 (1967).

A determination of whether a poised executive, with full knowledge of all the relevant facts, acting upon deliberate reflection would have discharged Mrs. Fenske for her remarks is not relevant to the present case. "An employer has the right to discharge an employee for any reason, whether it is just or not, and whether it is reasonable or not, as long as the discharge is not in retaliation for union activities or support. N.L.R.B. v. Ogle Protection Service, Inc., supra, 375 F.2d at 505 and cases cited therein. Anger and caprice are the prerogatives of an employer so long as they do not flow from anti-union animus. Gullett Gin Co. v. N. L. R. B., 179 F.2d 499 (5th Cir.1950), rev. on other grounds, 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951). An arbitrary decision as well as one based on just cause is acceptable absent improper motive. Hagopian & Sons, Inc. v. N. L. R. B., 395 F.2d 947, 950–951 (6th Cir.1968).

The only relevant inquiry here was whether a man like Pennock, armed with only such knowledge as he had, acting under all the circumstances of the case, would have been so unlikely to act as he did as to give rise to the inference that his actions were motivated by anti-union feelings rather than Mrs. Fenske's words and actions.

It was this inquiry which the Examiner failed to make. He disparaged as "subjective" Pennock's testimony that he was "extremely excited" by Mrs. Fenske's remarks, but it is the subjective feelings of Pennock which are the crux of the whole matter. The Examiner apparently questioned whether Pennock could "reasonably believe" payroll clerk Hopkins' report of Mrs. Fenske's remarks—but the reasonableness of this belief is again beside the point. That Pennock might have been foolish to believe the report is irrelevant; the only question of significance is whether or not he did actually believe it. Raytheon v. N. L. R. B., 326 F.2d 471, 475 (1st Cir.1964).

The Examiner stated: "I cannot view [Mrs. Fenske's conduct] as Pennock does in his testimony, as a disturbing 'insubordination' on his theory that no employee had previously expressed 'displeasure' on this score, or called the plant a lousy place to work' for that reason." Perhaps insubordination would be the only sensible ground for an employer to justify this discharge on if he were required to show that he had good cause but this employer did not have to show good cause and did not claim that the remarks were insubordinate. He testified that his motive was more personal; he resented what he saw to be Mrs. Fenske's ingratitude. He resented the fact "that she wasn't the least bit interested in an employer who had just provided the funds for her to have an emergency appendectomy operation and a normal recovery and also a vacation check." He testified that especially in light of the decision to keep her on despite tremendous layoffs he felt Mrs. Fenske's attacks on the Company were intolerable. By raising and rejecting an insubordination claim that was never made by the employer while overlooking the real thrust of that employer's testimony the Trial Examiner [and the Board by its adoption of the Examiner's findings] in effect ignored the only testimony that could shed light on the motivation for the discharge in question.

At a number of points in his discussion of the motivation issue the Examiner repeats his mistake. Thus he evaluates the fairness of the discharge in light of the fact that Mrs. Fenske was protesting a deduction policy of which she was unaware. Mrs. Fenske's knowledge is itself irrelevant; the question to be answered is whether or not Pennock knew of Mrs. Fenske's ignorance when he discharged her for her protest. The Examiner does not consider this question. In evaluating the anti-Company comments which led to Mrs. Fenske's discharge the Examiner considered only the words the employee said she uttered, although Pennock testified, without contradiction, that those were not the words reported to him. If the Trial Examiner chose to disbelieve Pennock's testimony as to what was told him he failed to so indicate; if he accepted Pennock's testimony, then the only language which was relevant to an analysis of Pennock's motive was that which he believed Mrs. Fenske had used—whether or not that was in fact the case. See Raytheon, supra; cf. N.L.R.B. v. Gotham Industries, Inc., 406 F.2d 1306, 1311 (1st Cir.1969).

In characterizing the employer's actions as betraying an improper motive the Trial Examiner not only viewed the matter from an improper perspective, he also distorted or ignored evidence uncontradicted in the record. Thus he concluded that Mrs. Fenske's remarks were typical of normal employee griping about pay checks; he ignored specific uncontradicted testimony that no employee had ever used language even approaching that which it was reported Mrs. Fenske had used. The Examiner suggests that Pennock's failure to reason with Mrs. Fenske after her statements on August 7th (the first of the two days on which she uttered remarks critical of the Company) illustrates that the remarks must merely have served as a pretext for the discharge; the uncontradicted testimony of Mrs. Fenske herself indicates, however, that she left the Company office immediately after uttering her remarks without seeking or ex-

pecting any comment from Pennock or anyone else. Perhaps, most importantly of all, in view of the Trial Examiner's unwillingness to believe that the remarks in question could have upset Pennock, the Examiner concluded that the failure to call the payroll clerk who reported the incidents to Pennock and observed his reactions suggests that she would contradict his story. There is again unchallenged testimony to the effect that the payroll clerk was no longer in the Company's employ and was presently under a doctor's care. Without the presence of further facts (such as an offer to postpone the hearing until the clerk recovered and a refusal by the Company) it would seem improper to draw any inference unfavorable to the Company from the Clerk's absence. This inference would be impermissible as a matter of law had the hearing been conducted in a federal court under the rules of evidence, *see* Boyer v. The Merry Queen (The Minerva), 202 F.2d 575, 578 n.7 (3d Cir.1953); *and see* 2 Wigmore, Evidence § 286 (1940 Ed.) While Congress had indicated that the Board and its Examiners may depart from such strict rules upon occasion, it has indicated an intention that the rules be followed wherever possible. *See* 29 U. S.C. § 160(b). There is no reason why both logic and the rules of evidence should have been ignored in drawing the adverse inference here.

■ While it is true that the decision of the Board and its Examiner in choosing between two conflicting inferences must be respected, N.L.R.B. v. Challenge-Cook, 374 F.2d 147, 152 (6th Cir. 1967), and cases cited therein, it is equally true that when the inferences accepted by the Board and the Examiner are not supported by substantial evidence or are colored by an improper view of the duties and rights of the parties, as is the case with many inferences made by the Examiner in this case, this Court has the duty not to accept such inferences. *See* N.L.R.B. v. Swan Super Cleaners, Inc., 384 F.2d 609, 613–614 (6th Cir.1967). When we remove from consideration the improper inferences made by the Examiner there is little in the record to suggest that an anti-union motive led to the discharge here.

We find a lack of substantial evidence on the record as a whole to support the Board's findings in this case. Accordingly enforcement of the Board's order is denied.