## ACE DORAN HAULING & RIGGING COMPANY, Petitioner,

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 71–1566.

United States Court of Appeals, Sixth Circuit.

June 14, 1972.

Richard D. Zaiger, Atty., N.L.R.B., Washington, D. C., for respondent; Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Charles N. Steele, Atty., N.L.R.B., on brief.

Charles E. Shanklin, Columbus, Ohio, for petitioner, George W. Hairston, George, Greek, King, McMahon & Mc-Connaughey, Columbus, Ohio, on brief.

Thomas F. Phalen, Jr., Dayton, Ohio, for intervenors; Knee, Snyder & Parks, Dayton, Ohio, on brief.

Before WEICK, EDWARDS and CELEBREZZE, Circuit Judges.

WEICK, Circuit Judge.

Ace Doran Hauling & Rigging Company (Ace), the employer, has petitioned to review an order of the National Labor Relations Board, reported at 191 NLRB No. 63, finding that it had violated Section 8(a) (5) and (1) of the National Labor Relations Act, as amended (29 U.S.C. § 151 et seq.), by refusing to bargain with the Teamsters Union which had been certified as the exclusive bargaining

representative of Ace's employees in an appropriate unit following representation proceedings. Chairman Miller dissented. The Board filed a cross-application for enforcement of its order and the Union was granted leave to intervene.

The principal issue before us is the appropriateness of the bargaining unit as determined by the Regional Director and approved by the Board, Ace contending that the unit inappropriately included single truck owner-drivers and non-owner drivers employed by multiple truck owners, and operating equipment leased to Ace, and that said single-owner drivers and multiple truck owners are independent contractors and are not Ace's employees. They operate out of two different terminals.

The Board also held that the multiple truck owner nondrivers were supervisors.

Ace is an interstate carrier of freight, operating in twelve states, transporting steel, machinery, and heavy articles. Its main office is located at the Blue Rock Road terminal in Cincinnati; it has twenty-three other terminals throughout the twelve states, including the Kellogg Avenue terminal in Cincinnati, all of which terminals are operated by commission agents.

Ace itself owns four tractors and trailers; it leases from single owner-drivers approximately fifteen tractors and trailers. These tractors and trailers operate only out of the Blue Rock Road terminal and are used to haul machinery. Three tractors and six trailers are leased from Clarence Schneider, a commission agent, who operates the Kellogg Avenue terminal. Two additional tractors and trailers are leased from Schneider and Gardner Truck Company, which also operates out of the Kellogg Avenue terminal. The tractors and trailers operating out of Kellogg Avenue terminal haul only steel.

Schneider has authority to solicit orders for hauling steel to be transported out of Cincinnati. He receives revenue from Ace for his equipment and drivers amounting to a percentage of the freight charges therefor, and he receives a commission for soliciting orders and operating the Kellogg Avenue terminal. At this same terminal Clarence Schneider also conducts a steel hauling operation for Besl Transfer Company and operates a garage, a service station, and wrecker business.

The representation issue here involved concerns only truck drivers operating out of the two Cincinnati terminals.

Four drivers are carried on Ace's payroll and operate its own equipment out of the Blue Rock Road terminal. Ten of the single owner-drivers operate out of this same terminal, and five of them operate out of the Kellogg Avenue terminal.

Ace is authorized to operate under a certificate issued by the ICC. It must, therefore, abide by extensive ICC regulations designed for the protection of the public. Under these regulations a carrier may augment its equipment by leases, but must have "full direction and control of such vehicles," and be "fully responsible of the operations thereof . . as if the carrier was the owner of such vehicles." One part of the lease agreement between Ace and the lessors provides:

> "The relationship between the Carrier and Owner shall be that of Independent Contractor . . . ."

In order to obtain a lease, an equipment owner must have his equipment pass a safety check by Ace, and any prospective driver must pass a physical examination and a check of his driving and safety records. These three procedures are required by ICC regulations. All drivers of leased vehicles must be approved by Ace.

The lease between the owner and Ace, in conformity with ICC regulations, places the equipment under exclusive possession, control, use and responsibility of Ace. Ace may sublease the equipment. The truck owner agrees to be compensated according to a rental percentage which is unilaterally determined by Ace on the basis of a predetermined revenue schedule. The owner agrees to furnish, and to pay the wages of, a qualified driver,

to withhold his income and Social Security taxes, to cover him for Workmen's Compensation, and to pay for "bob-tail" insurance. Ace, however, pays for all public liability, property damage, and cargo insurance. Further, the truck owner must pay all operational expenses of the vehicle, and must pay certain damages if caused by his own fault or carelessness; and he must maintain insurance coverage for collision, fire, theft, or other catastrophe. The owner must also pay maintenance expenses for the equipment and must conform the equipment according to all laws and regulations.

Occasionally Ace advances money for travel expenses of single owner-drivers and for repair of equipment, and then deducts the amount thereof upon payment for loads. Ace requires 30-day periodic inspections, and Ace's safety director conducts road checks.

Ace's central dispatcher works at the Blue Rock Road terminal, and he both controls and coordinates movement of freight from all Ace terminals, with assistance of local dispatchers at each terminal. This central dispatcher provides backhaul information for drivers operating out of the two Cincinnati terminals. Upon delivery of a load all drivers are instructed to call the central dispatcher in Cincinnati on the company WATTS line, concerning backhauls. Equipment owners or drivers may arrange backhaul loads with another carrier, but they are required to pay to Ace ten percent of the gross revenue derived therefrom, and they must take their trip lease insurance from Ace. In a few cases backhauls with certain companies are prohibited.

Drivers are required by ICC to keep a log book for each trip, and are required by Ace to file with it physical examination reports, accident reports, and some other documents. Drivers are free to select their own trip routes, except when carrying over-weight or over-size loads.

Owner-drivers can refuse trips offered to them, but if they do not appear at terminals and take hauls for a period of time, their leases are terminated. Owner-drivers have no regular schedule, are not required to call in at any specific time, and Ace has no right to call them in. Owner-drivers may take time off at their discretion. Ace may cause the discipline or discharge of single owner-drivers or nonowner-drivers only for being involved in an accident or for violation of ICC rules.

Multiple owner-nondrivers have and do exercise power to hire and fire their drivers; they also assign, transfer and direct their drivers. Single owner-drivers have the right to hire substitute drivers, and some have done so, although only sporadically.

■ Under the National Labor Relations Act an employer may not obtain judicial review of a Board decision establishing a bargaining unit, absent an order in an unfair labor practice proceeding. A.F.L. v. N.L.R.B., 308 U.S. 401, 60 S. Ct. 300, 84 L.Ed. 347 (1940); N.L.R.B. v. Checker Cab Co., 367 F.2d 692 (6th Cir. 1967); N.L.R.B. v. KVP Southerland Paper Co., 356 F.2d 671 (6th Cir. 1966). Here, Ace, having been found to have committed an unfair labor practice, may obtain a review in this Court of the propriety of the designated bargaining unit.

■ The Board, however, has wide discretion in determining the appropriate bargaining unit. Packard Motor Car Co. v. N.L.R.B., 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); N.L.R.B. v. Lund, 103 F.2d 815 (8th Cir. 1939).

The controversy here involves a determination of whether certain drivers of trucks leased to Ace are "employees" or "independent contractors" within the meaning of the Act. In 1947 Congress amended the Act to read:

"The term 'employee' shall include any employee, . . . but shall not include . . . any individual having the status of an independent contractor . . . ." (29 U.S.C. § 152 (3)).

This amendment was generated by an expansion of the Act's concept of "employee" beyond traditional limits by the

Board and the courts. In N.L.R.B. v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), the Supreme Court upheld an order of the Board which had greatly expanded the definition of "employee" under the Act, the Court relying on the "expertise" of the Board. The Court held that ordinary tests of the law of agency could be disregarded by the Board in determining whether petty occupational groups were "employees" within the meaning of the Act. The 1947 amendment was enacted because of congressional dissatisfaction with the ruling in *Hearst,* and to provide for a more traditional agency concept of "employee".

"The legislative history of the 1947 amendments to Section 2(3) indicates clearly the congressional intent that the status of an individual as an independent contractor or employee is to be measured by the yardstick of common law." Maxwell Co. v. N.L.R.B., 414 F.2d 477, 487 fn. 1 (6th Cir. 1969), McAllister, Senior J., dissenting.

"The obvious purpose of this amendment was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act.

". . . [A]ll the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total factual context is assessed in light of pertinent common law agency principles." N.L.R.B. v. United Ins. Co. of America, 390 U.S. 254, 256, 258, 88 S.Ct. 988, 989, 991, 19 L.Ed.2d 1083 (1968).

█ It is clear, then, what standard must be applied under the Act to determine the status of these drivers. There must be a factual determination of agency on the whole record, under common law agency principles. Nevertheless, "a determination [by the Board] should not be set aside just because a court would, as an original matter, decide the case the other way." N.L.R.B. v. United Ins. Co., *supra,* at 260, 88 S.Ct. at 991.

In the past, in making determinations such as the one involved here, the Board has employed the correct legal test, the "right to control" test. Deaton Truck Line, Inc., 187 NLRB No. 102, P. 22,635 (1971), enforced 337 F.2d 697 (5th Cir. 1964), cert. denied, Teamsters, Chauffeurs, Warehousemen, and Helpers, Local 612 v. N.L.R.B., 381 U.S. 903, 85 S.Ct. 1448, 14 L.Ed.2d 285; Tryon Trucking, Inc., 192 NLRB No. 123, P. 23,377 (1971); Reisch Trucking & Transp. Co., 143 NLRB No. 104 (1963).

█ The Regional Director's findings in the present case, which were upheld by the Board, were that the drivers employed at the two terminals, both single owner-drivers and nonowner-drivers, all performed similar duties, enjoyed similar working conditions, and had similar skills, and therefore all were employees of Ace. As to the single owner-drivers, we are of the opinion that both the Regional Director and the Board were correct.

A number of Board decisions, some affirmed in the Courts, have developed the principle that owner-drivers of vehicles leased to a company are "employees" of the company within the meaning of the Act, and are therefore appropriate members of a bargaining unit with respect to the company. See Deaton Truck Line, Inc., *supra,* 187 NLRB No. 102 (1971); Maxwell Co., *supra,* 164 NLRB No. 97, P. 21,364, 414 F.2d 477 (6th Cir. 1969); Tryon Trucking, Inc., 192 NLRB No. 123, P. 23,377 (1971).

In *Deaton,* the Fifth Circuit agreed with the Board's conclusion and findings, stating:

"We are satisfied that the degree of control exercised by Deaton over these individuals [drivers, including owner and multiple-owner drivers] as shown in part by the collective-bargaining history, is sufficient to support a finding that they are employees of Deaton both in law and as a 'matter of economic reality.'" (337 F.2d at 699).

In *Deaton* the lessors could carry cargo only for Deaton, which had exclusive con-

trol of the vehicles. The company had to approve a driver, and maintained a pool of drivers from which pool multiple owner-drivers selected other drivers. Deaton handled dispatches and supervised loading. Deaton could discharge any driver, and it carried on periodic road patrols, inspecting the trucks.

In Maxwell Co. v. N.L.R.B., *supra*, 414 F.2d 477 (6th Cir. 1969), this Court approved a Board finding that single owner-drivers and drivers who operated vehicles owned by others were employees rather than independent contractors. There the employer gave approval to the hiring of drivers, received trip reports and other records from drivers, and made inspections of the trucks. Moreover, the owners were restricted to haul exclusively for this carrier.

We do not find any substantial difference in the present case from those cases cited above involving single-owner drivers, which would justify a different result. Indeed, to hold that the single owner-drivers were not employees under the Act would be a substantial departure from these authorities, and would serve as a disrupting influence on well-established collective bargaining relationships.

Ace asserts that the only controls it has over the lessors are those required by ICC regulations, and that "employee" status cannot be based on that alone; however, we find substantial evidence of additional controls exercised by Ace over single owner-drivers. Consequently, the rationale behind our holding is based on both "additional controls" and the control and supervision exercised pursuant to ICC requirements.

It is our opinion, however, that those drivers who drive equipment leased by Clarence Schneider to Ace are not Ace's employees within the meaning of the Act. Under the "right of control" test the total factual context delineates significant differences between those drivers and the single owner-lessors who drive "exclusively" for Ace. Thus, those drivers are more appropriately classified as employees of Schneider, who

is certainly an "independent contractor". Any other result would greatly expand the meaning of the term "employee" under the Act, an expansion which Congress explicitly inhibited in 1947.

In addition to the operations which Clarence Schneider conducts for Ace at the Kellogg Avenue terminal, he conducts from the same location a steel hauling operation for the Besl Transfer Company; he runs a garage and a wrecker operation and rents trucks for "Easy Haul", all at the same location. Schneider has employees other than those who drive for Ace. Schneider utilizes his employee-drivers, including those who drive for Ace, to operate his wrecker service. Although Schneider testified that interchanges of employees "very seldom" take place, he did state that there had been some interchange between his Ace drivers and his other operations. Schneider alone has power to hire and fire his employees, and to determine their rates of pay, fringe benefits and working conditions. Schneider withholds from his employees' pay income tax, Social Security, and other benefits. Moreover, Schneider gives advances to all of his drivers and pays for their hotel bills while they are on the road.

These circumstances indicate to us that the drivers who operate Clarence Schneider's trucks are his employees rather than employees of Ace, and may not be placed in the same bargaining unit as employees on the payroll of Ace. It is significant that Schneider's drivers do not drive exclusively for the benefit of Ace, but from time to time they perform other work for Schneider. Single owner-drivers, on the other hand, operate exclusively for Ace on hauls leaving Cincinnati. Nevertheless, the additional indicia of Schneider's "right of control" over the drivers are also significant in reaching this determination.

There is testimony that the Schneider-Gardner operation is similar to that of Clarence Schneider; therefore, drivers of its equipment were also inappropriately designated as members of the bargaining unit.

The order of the Board is enforced only as to the truck drivers on Ace's payroll and single owner-drivers operating out of the Blue Rock Road terminal.

Since employees of Clarence Schneider and of Schneider and Gardner Truck Company were included inappropriately in the bargaining unit, enforcement of the Board order as to them is denied. Because of this disposition, we need not consider the other questions raised by Ace.

Enforcement granted in part and denied in part.