### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### CEMENT TRANSPORT, INC., Respondent.

### No. 73–1260.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 17, 1973.

Decided Jan. 22, 1974.

Rehearing Denied March 4, 1974.

Lawrence Levien, N.L.R.B., for petitioner; Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Assistant Gen. Counsel, Alan D. Cirker, Attys., N.L.R.B., Washington, D. C., on brief.

Louis E. Woolery, Louisville, Ky., for respondent; James U. Smith, Jr., Louisville, Ky., on brief.

Before CELEBREZZE and MILLER, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

CELEBREZZE, J., delivered the opinion of the Court, in which MILLER, J., joined.

O'SULLIVAN, J., dissented in part.

CELEBREZZE, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its Order of December 11, 1972, reported at 200 NLRB No. 122. In its Order and accompanying Decision, the Board adopted the Administrative Law Judge's conclusion that Respondent violated section 8(a)(1) and 8(a)(3) of the National Labor Relations Act.[1] The Board ruled

---

1. 29 U.S.C. § 158: "(a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

that the Company improperly interrogated its employees about their union sympathies before a representative election and illegally discharged Edgar Ray Thompson because of his organizational activities. It ordered Cement Transport to cease and desist from section 8(a)(1) and 8(a)(3) violations, to reinstate Thompson and make him whole, and to post appropriate notices.

Respondent contends that Thompson was an independent contractor, not an employee, that it committed no offense by questioning its drivers about their union leanings, and that Thompson was properly discharged for misconduct apart from his union activities. We turn first to the independent contractor issue.

Cement Transport, Inc., hauls cement for the Kosmos Portland Cement Company. While Cement Transport owns the trailers used in its business, it leases tractors from various individuals. Edgar Ray Thompson was one such lessor. A single owner-driver, Thompson had a standard lease with Respondent which provided that the tractor would be operated under the Company's direct supervision and control and "shall be devoted exclusively to the [Company's] business of transportation as much and as often as may be reasonably required by such business."

In Ace Doran Hauling and Rigging Co. v. N. L. R. B., 462 F.2d 190 (6th Cir. 1972), this Court held that in appropriate cases owner-drivers working for contract carriers could be considered employees rather than independent contractors, so that the Board had jurisdiction over single owner-drivers.[2] "The rationale behind our holding is based on both 'additional controls' and the control and supervision exercised pursuant to ICC requirements." 462 F.2d at 194.

*Ace Doran* was reaffirmed by this Court in N. L. R. B. v. Pony Trucking, Inc., 486 F.2d 1039 (6th Cir. 1973).

Cement Transport's operations are quite similar to those of Ace Doran, entailing both government-required supervision and additional controls. Cement Transport argues that *Ace Doran* can be distinguished because Doran paid for its drivers' cargo insurance (Respondent holds its drivers liable for stolen cargo), Doran got a percentage of revenues from its owner-drivers' backhauls (Respondent allows its owner-drivers to haul for others and keep the profit, but subjects them to recall at its behest), and Doran limited the routes its owner-drivers could take on deliveries (Respondent leaves the choice of roads to its drivers as a matter of practice but has the right to direct the routing.) Doran's discipline procedures may be more strict than Respondent's but they exist.[3]

While Respondent cites differences of fact, it has not shown differences of principle. Cement Transport has a sufficient *right to control* its single owner-drivers to sustain a finding that they are employees rather than independent contractors. It is the right to control, not its exercise, that determines an employee relationship, N. L. R. B. v. A. S. Abell Co., 327 F.2d 1, 4 (4th Cir. 1964); N. L. R. B. v. Steinberg, 182 F.2d 850, 857 (5th Cir. 1950).

Our review of the Board's decision is limited. If substantial evidence in the record supports the Board's conclusion, this Court is bound by such findings, even though the Board chose between "two fairly conflicting views" of the employee-independent-contractor distinction. N. L. R. B. v. United Insurance Co., 390 U.S. 254, 260, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). We find that the Board has done so in this case and

---

2. Under Section 2(3) of the Act, "The term 'employee' . . . shall not include . . . any individual having the status of an independent contractor." 29 U.S.C. § 152(3). The Board has no jurisdiction over independent contractors.

3. Once a driver signs in on the Company's maintained list, he is bound to haul any load assigned. Refusal to haul an assigned load results in a three-day suspension.

affirm its conclusion on the basis of *Ace Doran*.[4]

■ Second, Respondent objects to the Board's finding that it violated Section 8(a)(1) of the Act by coercively interrogating its employees before a representative election. The record shows that shortly after the 1971 campaign to organize Respondent's drivers began, Respondent's general manager asked three employees on five separate occasions whether they had signed Union cards and whether Edgar Thompson was asking their help in his organizing efforts. He did not caution the employees that no retaliation would flow from their answers. The untruthful responses of two of the employees demonstrated their natural fears about such questioning. We agree that under the circumstances, the general manager's questioning constituted inherently coercive interference with the employees' right freely to choose a bargaining representative, under Section 8(a)(1) of the Act. See N. L. R. B. v. Gissell Packing Co., 395 U. S. 575, 85 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Capital Broadcasting Corp. v. N. L. R. B., 479 F.2d 329 (6th Cir. 1973). Substantial evidence in the record considered as a whole supports the Board's conclusion on this point. N. L. R. B. v. Armstrong Circuit, Inc., 462 F.2d 355, 357 (6th Cir. 1972).

Third, Respondent argues that the Board erred in holding that the Company fired Thompson because of his union activities.

■ Our inquiry is whether substantial evidence in the record as a whole supports the Board's conclusion that Respondent discharged Thompson because of his Union activities. See N. L. R. B. v. Ogle Protection Service, Inc., 375 F.2d 497, 505 (6th Cir.), cert. denied, 389 U. S. 843, 88 S.Ct. 84, 19 L.Ed.2d 108 (1967); *cf.* Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); 29 U.S.C. §

160(e). The question of discriminatory motivation under Section 8(a)(3) is primarily factual, to be determined initially by the Board through its administrative apparatus. N. L. R. B. v. Murray Ohio Mfg. Co., 358 F.2d 948, 950 (6th Cir. 1966); N. L. R. B. v. Ogle Protection Service, Inc., 375 F.2d 497, 505 (6th Cir. 1967). "The Board, not the courts, has the delicate task of divining an employer's motives from the confusion generated when spirited organizational activity clashes with comparable efforts to eliminate it." N. L. R. B. v. Lou de Young's Market Basket, Inc., 406 F.2d 17, 21 (6th Cir.), remanded on other grounds, 395 U.S. 828, 89 S.Ct. 2125, 23 L.Ed.2d 737 (1969).

■ The burden of proving an employer's discriminatory motive in discharging an employee is on the General Counsel. N. L. R. B. v. Bangor Plastics, Inc., 392 F.2d 772, 777 (6th Cir. 1967); Lawson Milk Co. v. N. L. R. B., 317 F.2d 756, 760 (6th Cir. 1963). The Board found that the General Counsel had met that burden. The record is clear that Respondent was aware of Thompson's spearheading the organization of its drivers since 1967 and that it actively opposed such efforts. One campaign was aborted in 1969, when Thompson discovered that the Company had found out how many Union cards were being turned over to Teamsters Louisville Local 89. To avoid another leak, Thompson turned to Local 299 for aid in the 1971 campaign.

By July 15, 1971, Thompson had collected 38 signed authorization cards, representing substantially all the drivers eligible to vote. Between that time and the petition for an election in January, 1972, Thompson was advised by union officials to hold the cards. To maintain union interest, he continued to voice dissatisfaction with the Company's wage scale and to complain about company practices after July 15.

---

4. Respondent's single owner drivers were found to be "employees" in two other N.L.R.B. decisions. Cement Transport, Inc., 162 N.L.R.B. 1261 (1967); Regional Director's Decision and Direction of Election, Case No. 9–RC–9380, Mar. 22, 1972.

On October 25, 1971, the Company terminated Thompson's lease. The Administrative Law Judge found that Respondent's President Cummins, in a phone conversation the day after terminating Thompson's lease, told Thompson that his discharge was prompted by Thompson's "spreading that Union poison around." Cummins testified,

> I've known this man for a long time. He has been a good operator. There is no question about that. There is no fault to find there but he really never has worked for anybody else for any length of time. I just feel like as far as the companies that are in this area are concerned, we are probably as good a company to work for as any company in the country but I don't think he felt that way and so I suggested to him that he go somewhere else and work awhile. Maybe he would see that things aren't quite so bad at home as he thought they were and I knew people in the trucking industry around here and if he wanted me to say a word for him, I would tell anybody he was a good operator. Then, maybe some day if he felt differently about it, if he didn't feel that we were such a bunch of thieves and liars, we might talk again. Tr. 424.

Accepting the credibility assessments of the Administrative Law Judge [5] and considering the evidence above and the rest of the record, we find substantial evidence to support the Board's conclusion that Thompson was discharged because of his union-related activities.

Ordinarily this would end our review. Respondent, however, has asserted what amounts to an affirmative defense.[6] It charges that, in conducting his activities, Thompson made numerous false and derogatory statements about the Company itself, the general manager, and the Company president. It points out that Chairman Miller dissented from the Board's decision, finding that Thompson had accused his employer of bribing union officials.

█ In considering this contention, we note that an employer's good faith in firing an employee engaged in protected activity is not a defense to a § 8(a)(1) violation.

In sum, § 8(a)(1) is violated if it is shown that the discharged employee was at the time engaged in a protected activity, that the employer knew it was such, that the basis of the discharge was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact, guilty of that misconduct. National Labor Relations Board v. Burnup & Sims, 379 U.S. 21, 23, 85 S.Ct. 171, 172, 13 L.Ed.2d 1 (1964).

Since Thompson was actively engaged in a protected activity, and his discharge was prompted by alleged acts of misconduct in the course of his organizing efforts, the only remaining question is whether Thompson was guilty of misconduct so outrageous as to justify his discharge in spite of his protected activities.

█ In the context of a struggle to organize a union, "the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth," so long as the allegedly offensive

---

5. We will not normally disturb the credibility assessments of the Board or the Administrative Law Judge, who has observed the demeanor of the witnesses. N.L.R.B. v. Stemun Mfg. Co., 423 F.2d 737, 739 (6th Cir. 1970); N.L.R.B. v. Howell Automatic Machine Co., 454 F.2d 1077, 1079 (6th Cir. 1972).

6. The Company's assertion can be treated in one of two ways. First, it may be considered an argument that the "real reason" for discharging Thompson was his offensive actions, not his protected activity. Under this view, it is more an attack on the Board's conclusion (*discriminatory* discharge) than an affirmative defense. Second, it may be analyzed as a *bona fide* affirmative defense (even assuming a prima facie violation, the company had the legal right to discharge him because of gross improprieties). Because of our affirmation of the Board's conclusion, we need not choose between these two characterizations or delve into the legal issues they raise.

actions are directly related to activities protected by the Act and are not so egregious as to be considered indefensible. Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 61, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); N. L. R. B. v. Local 1229, Int'l. Brotherhood of Electrical Workers, 346 U.S. 464, 73 S.Ct. 865, 97 L.Ed. 1372 (1953); N. L. R. B. v. Washington Aluminum Co., 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L. Ed.2d 298 (1962). See also Hugh H. Wilson Corp. v. N. L. R. B., 414 F.2d 1345, 1355–1356 (3rd Cir. 1969); Crown Central Petroleum Corp. v. N. L. R. B., 430 F.2d 724, 731 (5th Cir. 1970); N. L. R. B. v. Thor Power Tool Co., 351 F. 2d 584, 587 (7th Cir. 1965).

■■■■ Under this standard, we cannot find that Thompson's advocacy of a "return to 65%," which concerned a higher compensation scheme Thompson believed the Company had taken from the drivers years ago, was indefensible or reckless, even if the 65% scheme never existed. We accept the Administrative Law Judge's credibility determination that Thompson believed the 65% scheme was once in effect, even though this may have been a false belief. Similarly, we cannot find Thompson's reference to Respondent's President as a "son-of-a-bitch" to be egregious or out of context in a labor struggle. See Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. at 60–61, 86 S.Ct. 657.[7] Nor do we find anything improper about Thompson's securing a copy of the Company's intrastate tariffs from the Kentucky Department of Motor Transportation. There is testimony in the record that in requesting a copy of the rates, Thompson told a state official that he had been unable to obtain a copy from the Company and that he knew

this was not true. Even assuming that Thompson had told a falsehood, the utterance of such an isolated and non-prejudicial remark could not justify his discharge. Yet, Respondent states that Thompson's going to the Kentucky Department was the "the straw that broke the camel's back," the incident which immediately provoked the termination of his lease. We reject the implication of Respondent's argument that an employee should fear asking a state official for public information about his Company. We find no disloyalty or insubordination in such an act.

Respondent's two remaining arguments concern an alleged threat and an accusation that a company official was bribing the union.

■■■ Several witnesses stated that Thompson had told them that he had helped build the company up and "he was going to help tear it down." If Thompson's alleged statements were actually made and if they amounted to an improper threat against the Company, the Company might have been justified in discharging him. N. L. R. B. v. Local 1229, 346 U.S. at 476, 73 S.Ct. 865. A close reading of the record, however, reveals that the "threat", even if made, should be considered a protected statement. The Company's witnesses stated that Thompson said he would "tear the Company down" only "if he didn't get what was coming to him."

The thrust of the threat was similar to that of a strike—that an employee will take appropriate action if the Company is not forthcoming on the employee's demands. Such a threat is at the very heart of labor-management relationship. Thompson's expressed means of "tearing the Company down," according to the testimony of the Com-

**7.** Profanity in labor disputes has been excused in many cases. Falcon Plastics-Division of B–D Laboratories, Inc. v. N.L.R.B., 397 F.2d 965 (9th Cir. 1968); Hugh M. Wilson Corp. v. N.L.R.B., 414 F.2d 1345, 1355–1356 (3rd Cir. 1969); Crown Central Petroleum Corp. v. N.L.R.B., 430 F.2d 724, 731 (5th Cir. 1970). In N.L.R.B. v.

Thor Power Tool Co., 351 F.2d 584 (7th Cir. 1965), for instance, an employer fired an employee after he had participated in a grievance session and had muttered "horse's ass" as he walked out the door. The Court found that this "remark furnished the excuse rather than the reason for the [employer's] retaliatory action." 351 F.2d at 587.

pany witnesses, would have been to complain to the U. S. Department of Transportation and the ICC about violations of safety and other regulations and take similar steps within an employee's rights. Thus, considering the entire context in which Thompson made his comments, we cannot find them to be recklessly malicious, insubordinate, or unrelated to his protected activity. The Company labels Thompson's campaign a "personal vendetta." The Board found them to be one man's effort to organize a union. Even if we were to come to a different conclusion after a trial *de novo* before us, we cannot disagree with the Board's assessment after reviewing the entire record. Universal Camera Corp. v. N. L. R. B., 340 U.S. at 488, 71 S.Ct. 456. Capital Broadcasting Corp. v. N. L. R. B., 479 F.2d 329, 330 (6th Cir. 1973).

Finally, the Company argues that Thompson's discharge was justified because, as Chairman Miller wrote in dissent, Thompson had circulated a "totally baseless rumor that his employer has been bribing a union official at the rate of $20,000 a year." Thompson denies making any such comment. Witnesses for the Company charge that he did. The Administrative Law Judge made no specific finding of fact as to whether Thompson actually started such a rumor.

The Board's majority accepted the Administrative Law Judge's explanation that Thompson had reason to suspect Company-Local 89 collaboration, since the Company had quickly found out the number of union cards obtained in 1969, when Thompson had tried to organize a unit under Local 89's auspices. Given this circumstance, we must agree that the rumor about Company-Local 89 collusion was not "totally baseless." Whatever the specific allegations may have been about a "bribe," even assuming that Thompson made them, they are among those matters best left to charge and counter-charge, with eventual resolution by the vote at a representative election. See N. L. R. B. v. Ben Pekin

Corp., 452 F.2d 205 (7th Cir. 1971). The accused party, of course, has recourse to private tort action, Linn v. United Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582.

Finding no activity which could have separately justified Thompson's discharge in the context of an organizational drive, we affirm the Board's conclusion that Thompson's discharge was a violation of Section 8(a)(3) and (1) of the Act. The Board's order will be enforced.

O'SULLIVAN, Senior Circuit Judge (dissenting in part).

I respectfully dissent from my brothers' affirmance of the Board's command that employee Johnson be reinstated with full back pay. I cannot believe that an employer is required to retain, or to restore to his payroll, a man who has given wide circulation to a story that such employer had avoided unionization by another union by a "payoff" of $20,000 a year to the President of that union. I share the relevant view of the Chairman of the NLRB.