953 F.2d 1384
 139 L.R.R.M. (BNA) 2400
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
SEVERANCE TOOL INDUSTRIES, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 91-5440, 91-5688.
 United States Court of Appeals, Sixth Circuit.
 Feb. 5, 1992.
 
 Before JONES and MILBURN, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The petitioner-employer, Severance Tool Industries, Inc. ("Company"), seeks review of a decision of the National Labor Relations Board ("Board") to reinstate an employee with back pay, where the employee was discharged because of vulgar language and disruptive conduct in connection with protected concerted activity. The Board seeks enforcement of its decision.
 
 
 2
 * The Company hired Anthony VanDeventer on August 21, 1988, as a tool changer and grinder. His job performance was rated satisfactory, always between a 2.5 and a 3.0 on a zero to four scale. When, in January of 1989, the International Union of the United Automobile, Aerospace and Agricultural Implement Workers of America ("Union") began to organize the production and maintenance workers at the Company, VanDeventer became one of the Union's leading supporters. He was one of fifteen of the approximately seventy-four production and maintenance workers to attend the Union's first organizational meeting, held on January 6, 1989. He became a member of the Union's organizing committee, whose names were submitted to the Company president, Robert Severance. VanDeventer was visibly busy with a lot of Union business: handing out and collecting authorization cards, posting Union bulletins on the Company bulletin boards, and serving as the Union's sole election observer at the March 16 election. The election results placed the Union in the role of exclusive bargaining agent for the workers, by a vote of forty-nine to twenty-three, with two votes challenged. VanDeventer was elected to the Union's four-member bargaining committee. The Company was notified of this fact on April 13, 1989, and of the fact that VanDeventer was a Union representative for the day shift on April 19.
 
 
 3
 The Company had shown a strong anti-union animus throughout the organizational period and after the election. Workers testified that management employees were seen taking down Union bulletins from the bulletin board when nothing else was removed. One manager felt that having so many men from his shift on the Union's organizing committee made him "look awful bad," so much so that he threatened the workers with harder work and stronger enforcement of Company rules. J.A. at 28. The Company thereafter repudicated that incident, disciplining the manager who made the statement and assuring workers through a posted notice that the statement had been made without the knowledge or permission of the Company. Nonetheless, prior to the election, the Company posted a letter to its employees warning that the Union could be more trouble than it was worth.
 
 
 4
 Robert Severance was particularly against the Union. In a newspaper interview, he described himself as "dismayed" that his workers had selected the Union; on another occasion, he requested that a supervisor "get rid of" a "troublemaker" whose only fault was that he was active in the Union. Severance suggested that he would prefer to relocate the Company back to the South than to give in to the Union.
 
 
 5
 Less than two weeks after VanDeventer was identified to Severance as an elected leader in the Union, the two men met as a result of the following circumstances. When VanDeventer and another employee, Paul Hansen, were discussing the amount of vacation pay they would receive as first-year employees, they discovered some confusion as to that amount and asked their supervisor, John Pease, to clarify. VanDeventer testified that on April 4, Pease told them that their vacation pay would be two percent from the date of hire until the end of that calendar year, plus an additional four percent on the anniversary of their hire date. On April 18, a third employee, Kevin Harns, complained that his vacation pay only amounted to four percent. On April 19, VanDeventer met with Pease to clear up the discrepancy. At this time, Pease pointed out that, in the Company handbook, the policy was 4%. VanDeventer attempted unsuccessfully to meet with Vice-President Shalaty. Finally, in an effort to talk to Severance about the issue, he used a Company program called "Speak Easy" to arrange a meeting. The program allowed an employee, by filling out a form, to communicate his grievances to management. He requested an explanation of the vacation-pay question, and Severance agreed to meet with him on April 25, 1989.
 
 
 6
 The two men gave different versions of the meeting. VanDeventer testified that he told Severance that he and Hansen had a question about vacation pay. He related the conversation they had had with Pease and offered to call in Hansen to support his statements. Severance replied that this meeting did not concern any employee except VanDeventer, and then referred him to the Company handbook, as Pease had. Severance added that he had known Pease for twelve years, and VanDeventer for only one, to which VanDeventer replied that Severance had only known him since the organizing drive for the Union. This prompted Severance to end the interview, according to VanDeventer, who told Severance he would inform the Union members of the Company's promise and denial. He then tried to turn the subject to his most recent evaluation, which had taken place the previous day, but Severance refused to discuss anything further with him. VanDeventer then left, saying on his way out, "Son of a bitch." He claims he did not raise his voice or slam the door on the way out.
 
 
 7
 Severance's version is basically the same as VanDeventer's until the point at which he referred the employee to the Company Handbook. Thereafter, his version differs from VanDeventer's primarily in that he alleges that VanDeventer began yelling at him and making accusations. He testified that he told VanDeventer he would not tolerate being yelled at in his own office, so VanDeventer would have to leave. After attempting to turn the conversation to his evaluation and being refused, VanDeventer slammed the door open on his way out, yelling that he was going to tell everyone what Severance's "true colors" were, and "plaster it all over the place." He did not hear VanDeventer say "son of a bitch," although he says other managers in nearby offices reported it to him. Indeed, several managers testified that they heard the oath, and some claimed to hear loud talking coming from the office during the time of the meeting.
 
 
 8
 That same day, Severance, through John Pease, suspended VanDeventer for three days. On April 28, 1989, the third day of VanDeventer's suspension, Severance had VanDeventer removed from the payroll.
 
 
 9
 The General Counsel of the Board responded to VanDeventer's charges against the Company by filing a complaint on his behalf on June 28, 1989. On June 29, 1990, an Administrative Law Judge ("ALJ") found, inter alia, that the Company's discharge of VanDeventer was a violation of § 8(a)(1) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1) (1988),[1] and ordered the Company to reinstate VanDeventer with back pay. The Company appealed to the Board. On February 28, 1991, the Board upheld the ALJ's decision as to the § 8(a)(1) violation and the reinstatement remedy. On April 10, 1991, the Company filed a petition for review with this court pursuant to 29 U.S.C. 160(f) (1988).
 
 II
 
 10
 * The question before us is whether substantial evidence on the record as a whole supports the Board's finding that the petitioner violated § 8(a)(1) of the Act by suspending and discharging VanDeventer because of the manner in which he protested the petitioner's vacation pay policy. The Court of Appeals, in reviewing a conclusion of the Board which weighs an employer's right to maintain discipline against an employee's right to participate in protected concerted activity, should uphold the Board's findings of fact if they are supported by substantial evidence. Great Lakes Steel v. NLRB, 625 F.2d 131, 133 (6th Cir.1980); accord NLRB v. Chelsea Lab., Inc., 825 F.2d 680, 683 (2d Cir.1987), cert. denied, 484 U.S. 1026 (1988); see 29 U.S.C. 160(e) (1988).
 
 B
 
 11
 The Supreme Court, in NLRB v. Transportation Management Corp., 462 U.S. 393 (1983), held that the Board has properly and consistently construed the Act as providing that the General Counsel, to establish an unfair labor practice, "need show by a preponderance of the evidence only that a discharge is in any way motivated by a desire to frustrate union activity." Id. at 398-99 (emphasis added). The Court also held that the employer can, as an affirmative defense, prove "that without regard to the impermissible motivation, the employer would have taken the same action for wholly permissible reasons." Id. at 399; see also NLRB v. Cement Transp., Inc., 490 F.2d 1024, 1029 (6th Cir.), cert. denied, 419 U.S. 828 (1974); Wright Line, Inc., 251 N.L.R.B. 1083, 1088-89 (1980).
 
 
 12
 The case at hand is a very difficult one. The ALJ's findings of fact, which were adopted by the Board, included a finding that a strong anti-union animus existed. This suggests that the General Counsel met his burden of proof. The Company argues, however, that it has established the affirmative defense--that it would have fired VanDeventer, despite its anti-union animus, for wholly permissible reasons--in that the ALJ found that "the [Company] discharged the employee solely as a result of this episode [in Severance's office]." J.A. at 32. Moreover, the Company offered testimony to show that in the past ten years, three employees had been charged with insubordination, and that all three of those employees were discharged. This, they contend, proves that VanDeventer would have been discharged regardless of the Company's anti-union animus.
 
 
 13
 While the Company's argument is not without some force, we will nonetheless enforce the Board's decision. Our reading of the ALJ's opinion disagrees with that of the Company, which construes the opinion as holding that anti-union animus had nothing to do with VanDeventer's discharge. The statement the Company relies on says that the discharge was "solely [the] result of this episode." A closer look reveals that "this episode" consists of nothing besides protected concerted activity conducted in a potentially objectionable way. The ALJ himself states in the very next paragraph: "One of the reasons for the discharge was VanDeventer's statement to Severance that he intended to inform the employees of the Company's 'true colors.' " Id. (emphasis added). This statement shows that the ALJ believed that anti-union animus did play a part in VanDeventer's discharge. His ultimate conclusion that the Company had violated the Act, then, implies that he did not find that the Company would have discharged VanDeventer for wholly permissible reasons.
 
 
 14
 Moreover, as the ALJ stated in his opinion, even if VanDeventer's loud and obscene conduct was the sole reason for his discharge, the Company still violated the Act because the discharge was an "overreaction"--improperly motivated by anti-union animus--to acts which were clearly protected concerted activity and which did not include any threats or acts of violence. The General Counsel cites a string of cases that support the proposition that merely rude conduct or vulgar language, in the course of protected § 7 activity, is "insufficient to deny [an employee] the protection of the Act." J.A. at 33; see, e.g., Cement Transport, Inc., 490 F.2d at 1029-30; Chelsea Lab., Inc., 825 F.2d at 682-83 (holding that some "salty language or defiance" must be tolerated); Syn-Tech Windows Systems, Inc., 294 N.L.R.B. No. 60, 1989-1990 NLRB Dec. (CCH) p 15,641 (June 8, 1989). The Company claims that VanDeventer's conduct was insubordination, meriting discharge, but the ALJ clearly found otherwise: "Even though the [Company] characterized VanDeventer's conduct as insubordinate, belligerent, and threatening, the record only supports a finding of disrespectful, rude, and defiant demeanor and the use of a vulgar word." J.A. at 33.
 
 
 15
 While the Company argues that the Transportation Management affirmative defense is applicable to its situation, we do not find that it has proven its argument to be true. We would also reemphasize that the fundamental question in this case is whether the discharge was in any way motivated by a desire to frustrate union activity. We find it difficult, where an employer has asked a supervisor to "get rid of" one employee who is seen as a "troublemaker" simply because of his union activity, to believe that another employee, who happens to be a union ringleader, has been fired solely because he protested a vacation pay issue on behalf of some fellow workers too loudly, too vulgarly, and with too little respect for the company president. One might well find that substantial evidence from this record supported the Board's finding that the Company violated § 8(a)(1) of the National Labor Relations Act in discharging VanDeventer, and we do.
 
 III
 
 16
 Accordingly, we AFFIRM the Board's decision to reinstate Anthony VanDeventer.
 
 
 
 [1]
 Section 8(a) of the Act provides that "[i]t shall be an unfair labor practice for an employer--(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section of this title...." Section 7 gives employees the right to organize and participate in union activities. See 29 U.S.C. § 157 (1988)