NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

OGLE PROTECTION SERVICE, INC.,
and James L. Ogle, an individual,
Respondent.

No. 16996.

United States Court of Appeals
Sixth Circuit.

April 7, 1967.

498

Clarice Feldman, N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Elliott Moore, Attorney, N.L.R.B., Washington, D. C., on brief, for petitioner.

David E. Burgess, Detroit, Mich., MacFarlane, Tolleson, Burgess & Mead, Robert D. Welchli, Detroit, Mich., on brief, for respondents.

Before O'SULLIVAN and PHILLIPS, Circuit Judges, and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

This cause is before the Court upon the petition of the National Labor Relations Board for enforcement of its order, issued November 6, 1964, against Ogle Protection Service, Inc. and James L. Ogle, the respondents herein. This Court has jurisdiction of the proceeding, the alleged unfair labor practices having occurred in Detroit, Michigan, within this judicial circuit. Section 160(e), Title 29, U.S.C. The Board determined that the respondents committed unfair labor practices in violation of Sections 158 (a) (1), (3) and (5), Title 29, U.S.C.

Ogle Protection Service, Inc., hereafter referred to as respondent, is a Michigan corporation, engaged in the business of providing plant protection services for commercial establishments and hospitals. All of respondent's stock is owned by James L. Ogle, its president and general manager, and his wife, a director of the corporation, but otherwise inactive in the business.

Since 1957, the International Union, United Plant Guard Workers of America, Local 114, hereafter referred to as the Union, has been the collective bargaining representative of respondent's employees. Benton Bilbrey and Willie England were president and vice president, respectively, of the local union. More than sixty days prior to the expiration, on July 15, 1962, of the then existing collective bargaining agreement, the Union sent respondent a notice of termina-

tion and a request to negotiate a new contract. After a preliminary meeting on July 9th, the parties on July 10, 1962, signed an agreement extending the contract indefinitely subject to termination at ten days' written notice by either party.

At a meeting on August 14, 1962, Ogle agreed to all provisions of a new contract except those classified as "economic", which included holidays and holiday pay, insurance and wage scales. A third meeting on September 19, 1962, still did not produce agreement on the economic issues. Ogle, because of illness, cancelled two meetings which were scheduled to take place in early October. Bilbrey telephoned Ogle on October 9th and accused him of stalling. Ogle countered by saying that the union was trying to put him out of business. A strike vote was called on October 16th. Although a strike was authorized, it never took place. When Bilbrey telephoned Ogle on October 18th to resume negotiations, Ogle said that he was sick and that David Colman, an attorney, who had previously negotiated a contract with the Union for the respondent, would represent the respondent. Bilbrey testified that Ogle stated to him that Colman had full authority to negotiate the contract. Ogle never specifically denied making this statement, but repeatedly testified that he only called Colman in to assist him, and did not authorize him to agree to a contract.

A meeting was arranged and held on November 2, 1962, between Colman, Bilbrey and three employee committeemen. Colman requested and the Union acceded to certain language changes in portions of the contract already agreed upon. With respect to certain Union requests Bilbrey stated that Colman said that although he had full authority to reach an agreement, he felt that he should first consult with Ogle. Colman was never called to testify.

The next meeting was held at respondent's offices, with Bilbrey, England and the three committeemen representing the Union, and Colman and Ogle representing the respondent. The Union agreed to withdraw several proposals made at the previous session. Those present disagreed as to whether or not the parties agreed to a wage scale. Bilbrey, England and one committeeman testified that Ogle agreed to the new wage scale, "even though it might break him." The Union did agree at this time to another meeting in January in the event respondent could not shift the cost of the wage increase onto their customers. Ogle and the two other committeemen testified that everything but wages was agreed to and that they would meet again in January to discuss wages. These two committeemen turned against the Union in early 1963 and were called as witnesses by the respondent. The hearing examiner concluded that Ogle reluctantly agreed to a wage increase with the expectation that if he could not obtain corresponding increases from his customers, the scale would be lowered by subsequent negotiations. Bilbrey stated that having agreed to the terms it was decided that Colman would draw up the completed contract.

Bilbrey agreed to draft the contract, after being informed twice by Colman that the press of other work prevented him starting it. On December 11, 1962, the contract was completed with the exception of the insurance clause. Bilbrey called Colman and Colman dictated the clause to Bilbrey's secretary over the telephone. On the following day, Bilbrey sent six copies of the contract to Colman's office, and Colman agreed to have them signed by December 14th. Not having received them on the 14th, Bilbrey called Colman who said that other matters had prevented him from looking at them. Colman said he would study them over the weekend and would deliver them signed on Monday morning, December 18th. When he did not receive them on December 18, 1962, Bilbrey called Colman who said that he had proofread the contracts, found them satisfactory, would send them over to Ogle for signature and that Ogle would deliver them to Bil-

brey by the close of the day. At 9:30 that evening, Bilbrey called Colman at his home to inform him that he had not yet received the signed copies. Bilbrey had called a ratification meeting for the next morning. Colman was suprised that Bilbrey did not have the papers and told him to call back in an hour. Bilbrey did so and Colman said that Ogle promised to have the signed contracts at the union hall by nine o'clock the next morning, before the ratification meeting.

Even though the papers were not there as scheduled Bilbrey went ahead with the meeting, and those present voted to ratify. Following the meeting Bilbrey telephoned Ogle who said that his son had taken the copies to respondent's office by mistake. When Bilbrey accused Ogle of stalling again, Ogle replied, according to Bilbrey, "I'll tell you right now, I'm not going to go through with this agreement." Bilbrey replied that he believed there was a contract and was sending England to pick up the signed contracts. When England went to pick them up he was only given two copies, both unsigned. Ogle stated to England that he was glad that his son had made the mistake because now he was not going to sign them. Several subsequent meetings did not produce any change in the positions of the parties.

On January 18, 1963 Ogle sent the Union a ten-day notice terminating the interim agreement of July 10, 1962. Ogle testified that this notice was intended to be a total severance of all relations with the Union. Between February 4th and May 20, 1963, the Union sent five written grievances to the respondent by certified mail, all of which were returned unopened. On February 4, 1963, Ogle refused to process a grievance presented by a union committeeman stating, "As far as we are concerned, we have no union."

On this state of the record the hearing examiner and the Board found that the respondent violated Section 158(a) (5) and (1), Title 29, U.S.C., by repudiating and refusing to sign a collective bar-

gaining agreement reached earlier, and by refusing to recognize and negotiate with the Union concerning grievances after January 18, 1963. The Board ordered respondent to sign the agreement if requested by the Union, or, if no such request was made, to bargain for a new contract, and to cease and desist from refusing to recognize and deal with the Union with respect to its employees' grievances.

■ Section 158(a) (5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, * * *." Section 158(d) states that included within the obligation to bargain collectively is "the execution of a written contract incorporating any agreement reached if requested by either party, * * *." Failure to execute and sign an agreement incorporating the terms of a negotiated contract is an unfair labor practice. H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; N.L.R.B. v. Ohio Car & Truck Leasing, Inc., 361 F.2d 404 (C.A. 6); Stackhouse Oldsmobile, Inc. v. N.L.R.B., 330 F.2d 559 (C.A. 6); Standard Oil Company v. N.L.R.B., 322 F.2d 40 (C.A. 6).

■ The scope of our review is limited to determining if the record contains substantial evidence to support the findings of the Board. Section 160(e), Title 29, U.S.C.; Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284. The credibility of witnesses is generally a matter for the determination of the hearing examiner and the Board. Keener Rubber, Inc. v. N.L.R.B., 326 F.2d 968 (C.A. 6), cert. den. 377 U.S. 934, 84 S.Ct. 1337, 12 L.Ed.2d 297; N.L.R.B. v. Herman Bros. Pet Supply, Inc., 325 F.2d 68 (C.A. 6); N.L.R.B. v. Bendix Corporation (Research Lab. Div.), 299 F.2d 308 (C.A. 6), cert. den. 371 U.S. 827, 83 S.Ct. 47, 9 L.Ed.2d 65. We conclude that there is substan-

tial evidence in the record to support the Board's determination that respondent committed unfair labor practices in refusing to execute the contract and in refusing after January 18th to process union grievances.

The Board also found that respondent committed unfair labor practices in discharging two of its employees, Harold Leeth and Thomas Lewis, because of their union activities, in violation of Section 158(a) (3) and (1), Title 29, U.S.C. The issue before the Court, concerning these discharges, is whether there is substantial evidence in the record to support the Board's conclusions. Section 160(e), Title 29, U.S.C.

Harold Leeth began working for the respondent in July, 1962. After two weeks on his first assignment, he was transferred because of complaints of inefficiency and failure to perform his duties properly. Late in November, 1962, Leeth was notified that he was being transferred from Annapolis Hospital, where he had worked for two months, to Seaway Hospital. Another guard, Butler Hamilton, was transferred to Annapolis Hospital. Both Hamilton and Leeth were unhappy with the transfers, and decided to take the matter up as a grievance. On December 3, 1962, they took the necessary forms to Thomas Lewis, their committeeman, who was on duty at Women's Hospital. While still on duty, Lewis called Glenn I. Orr, respondent's division manager in charge of the guard department, who transferred the call to Ogle. Lewis testified that Ogle told him to tell Hamilton and Leeth that they were immediately discharged. Orr testified that Ogle told him that he had told Lewis that the men were discharged. Ogle denies saying this, but states that he told Lewis that the men should be discharged for interfering with another employee while on duty and that Hamilton and Leeth should call him after leaving the hospital. Hamilton and Leeth called Ogle again from the Union Hall. Ogle told Leeth to come in the next morning. As this time Ogle informed Leeth that he was being trans-

ferred to the emergency room at Mt. Carmel Hospital. Neither Leeth nor Hamilton lost any pay as a result of this incident.

Clarence Masuch was Sergeant of Ogle's guards at Mt. Carmel Hospital when Leeth worked there. He testified to receiving several complaints about Leeth's work. One patrolman complained that Leeth took extended breaks and that Leeth failed to perform his duties properly which included keeping the drives and parking lot clear of traffic. Another guard complained similarly to Masuch. The Mother Superior complained to Masuch that once when she telephoned Leeth and asked him to do a job for her, which he was supposed to do, Leeth said he could not leave the emergency room to do it and he did not. A report of this incident was made and Orr was notified of it by Masuch. One of the guards who complained to Masuch that Leeth's breaks were too long, testified that on several occasions Leeth was late in relieving him thereby throwing him off schedule. After receiving several of these complaints, Masuch, on February 1st, telephoned and reported these complaints to Orr.

Orr's handwritten note of the telephone call from Masuch indicated that on January 31st, Leeth took a one-hour-and-twenty-minute break, that Leeth made many telephone calls while on duty, that he failed to keep the drives clear and to assist people out of the cars, and that someone from the hospital administration was going to call the Sisters the next time he got a complaint. On February 2, 1963, Orr telephoned Leeth and told him that he was suspended for two weeks. Leeth took the matter up with his union committeeman, who was told by Ogle that as far as he was concerned there was no union, and that if Leeth wanted to talk the matter over with him to do it himself. Ogle returned unopened the formal union grievance notice which was sent by certified mail.

After the two-week suspension was up Leeth telephoned Orr who transferred the call to Ogle. Leeth was told to come

to the office the following day. Ogle told Leeth that he had a good position for him. Ogle admitted making a remark to the effect that the last time Leeth was in his office he had to have a committeeman there holding his hand. Ogle testified that he warned Leeth that this was his last chance. Leeth did not deny receiving such a warning.

Leeth began working at the Metropolitan Hospital on March 1, 1963. After being on the job for several weeks, Ogle complimented Leeth on solving a problem that had existed for six months. On May 1, 1963, David Singer, an administrative assistant at the hospital having responsibility for the guards, telephoned Orr and requested another guard to replace Leeth. He told Orr that he was not satisfied with Leeth's performance, that there was some difficulty with his relations with supervisors, and that he was in the physician's room when he was not supposed to be there. Singer stated that he had once found Leeth smoking on the premises contrary to the rules of the hospital. He asked that Leeth be replaced. Leeth testified that late in April, the afternoon guard told him that he ate in the physician's lounge and suggested that Leeth eat there also. Leeth did so and there was a complaint after which he stopped eating there.

Early the following Monday, May 6, 1963, Orr testified that he called Leeth and told him not to report to work that day, but to come to the office. Orr stated that in this telephone conversation he told Leeth that he was fired because they had received complaints about him again. Orr said that he told Leeth he was warned the last time, and now he was through. Orr testified that thereafter Leeth kept calling him in hopes that he would be able to find something, or do something for him.

Leeth's version of these conversations is substantially different. Leeth testified that when Orr first called him, Orr told him not to report to Metropolitan but that Orr would call back tomorrow because Ogle was transferring him elsewhere. Leeth stated that Orr called him

back and told him that he would have to figure out a place to put him. Leeth called Orr several times in the next several weeks. In one conversation, Leeth stated that Orr told him that he had not done his job well at Metropolitan, but that he was still looking for another position for him. In another conversation, Leeth stated that Orr said that he had found several positions for Leeth, but that Ogle had vetoed all of them. On the last telephone call, Leeth stated that he was told by Orr that he was warned previously and was fired, but that he was in the right. The afternoon following the last telephone conversation Leeth went to the respondent's office and handed in his badge and picked up his check. At this time Orr said that he would give Leeth a recommendation, that he had done his job well and did not know why he was being fired. Orr admitted saying he would give Leeth a recommendation because he did not like to keep a man out of a job.

Upon consideration of this evidence, the hearing examiner and the Board found that Leeth had been discharged for his union activities in violation of Section 158(a) (3), Title 29, U.S.C. The Board did not believe that Ogle warned Leeth at the time of his prior suspension, that another complaint would result in his discharge. The Board believed Leeth's testimony that he had not been informed that he was discharged when he was told by Orr, on May 6, 1963, not to report to work. The Board discredited Orr's testimony that he informed Leeth that he was discharged on that occasion. The examiner thought that a suspension rather than discharge would make the respondent's explanation look more plausible. The hearing examiner concluded that to avoid committing an unfair labor practice by discriminatorily discharging Leeth at the time of his prior suspension when Ogle made a remark to Leeth that he had to have a union man holding his hand, Ogle constrained to defer action until a later time. Believing that Orr told Leeth that he was looking for another position

for Leeth, the Board felt that Ogle must have intervened for some unrevealed reason. The Board accounted for Leeth's discharge on the basis of respondent's dislike of the union, and the "hope of Ogle that a turnover of personnel which would eliminate strong union adherents would be a means of abating what, to him, was a nuisance, for Leeth was quite evidently not discharged for any fault that might reasonably be the basis for discharge." Finding an unfair labor practice in Leeth's discharge, the Board ordered reinstatement with back pay.

Thomas Lewis, the other discharged guard, began working for respondent in the spring of 1960. In June 1961, Lewis was transferred from his position at Providence Hospital, after respondent had received complaints about liquor on his breath. In spring or early summer 1962, Lewis received a two-week suspension after an administrator of Metropolitan Hospital, where Lewis was working, complained to Orr that Lewis' breath smelled of liquor. At this time both Orr and Ogle warned Lewis against a recurrence. Late in 1962, Lewis was reassigned to a desk job in the lobby of Women's Hospital.

Elmer Boer, the hospital official having responsibility for the guards, stated that in early 1963, he detected liquor on Lewis' breath, but did nothing at the time. On April 28, 1963, the hospital received the following anonymous letter:

"Dear Madamn

"This is to tell you how unfair it is to have a drunk guard over Patients from City Hospital. Carry a gun. I am a white woman and he let me stay in chair until another white woman ask him what was wrong with him and wheel me to elevator. Drunk Breathe smelled terrible, Everyone laughing at him even other guard said he was drunk. And then had Nerve to put Wrist Band on my arm. Guard called him Tom. Do you know your guard that Well? I'm also writing all the newspapers. Do you think it fair to us. Because we cannot pay? Wer'e human to. We want respect.
From a white city Patient."

Boer was absent from the hospital on sick leave when the letter was received, and did not return until May 13, 1963. The matter was handled by Miss Malloy, the administrator of Women's Hospital. Early in May, Miss Malloy telephoned Orr, after a staff meeting at which the conduct of the guards was discussed. Orr met Malloy and she showed him the anonymous letter. Orr retained this letter and took the matter up with Samuel Caputo, respondent's Sergeant at the hospital. Caputo said that the letter might have been a spite letter, but also reported that he had received complaints of liquor on Lewis' breath from other guards. It was stipulated that the testimony of five guards would be to the effect that they smelled liquor on Lewis' breath. Orr showed Lewis a copy of the letter early in May.

Sergeant Caputo also testified that on May 4, 1963, he detected the smell of liquor on Lewis' breath, that Lewis did not understand his instructions, and that he was not very stable. Caputo stated that he telephoned Orr to report that he detected liquor on Lewis' breath.

Boer testified that on May 17, 1963, four days after he returned to work, he was shown a copy of the anonymous letter at a staff meeting. Boer testified that there were no other guards named "Tom" on duty at the hospital. This letter, plus the fact that Boer previously smelled liquor on Lewis' breath, made Boer decide that something must be done. Boer talked to Caputo about the matter, telling him that they could not have any people on the premises who were drinking or who even had the smell of liquor on their breath. He stated that Caputo took the matter up with Orr. Caputo testified that on May 17, 1963, Boer told him that he thought it would be best for the hospital and the respondent to remove Lewis. Caputo related this message to Orr on the same day.

Orr's testimony makes no mention of any such conversation with Caputo on May 17th. He was, however, not questioned about it. Orr testified, that on May 16th or 17th, though he was not sure of the date, he met with Boer at the hospital. Orr stated that Boer told him that he was unaware of the letter and had to send for it. Boer related the earlier incident wherein he smelled liquor on Lewis' breath. Boer stated that something would have to be done. Boer's testimony related a similar meeting, but places it at a later date. Boer said that within a week or two after May 17, 1963, Orr visited Boer's office to discuss the matter with him. Orr related these matters to Ogle.

At around nine o'clock, Sunday evening, May 19, 1963, Orr telephoned Lewis and told him not to report to work Monday morning but to come to the office and see Mr. Ogle. Lewis stated that Orr also told him to pick up his check but did not know what the matter was about. At about ten o'clock that same evening Lewis telephoned Ogle, who told him that he was being fired for having liquor on his breath again. The following morning, Lewis said he went to the respondent's office to pick up his check. Lewis said he spoke with Orr about his vacation money. Orr, according to Lewis, said that he did not know anything about it and told him to see Ogle because he was tired of having the buck passed on to him. Orr remembered only a very short conversation about Lewis' pay check being ready. Lewis testified that when he spoke with Ogle about the matter Ogle stated that he had taken a sample of the liquid contained in the thermos Lewis brought to work with him. Later in the conversation, Lewis said that Ogle denied actually taking one, but only said that he could have taken one. Ogle's version of the "thermos jug" conversation was that when he asked Lewis if he carried the liquor in his thermos, Lewis reddened. Ogle further asked Lewis what Lewis would do if he ever took such a sample. Lewis denied carrying liquor in his thermos or ever drinking on the job. Ogle repeated to Lewis the reasons for his discharge, and Lewis left.

The first hearing on the charge concerning the respondent's refusal to bargain, was scheduled to take place on May 21, 1963, two days after Lewis was discharged. The Board had subpoenaed Lewis. Orr testified, that inasmuch as Ogle was the only person concerned with respondent's union matters, he did not know of the hearing until May 21st. Ogle testified that he was unaware of the fact that the Board had subpoenaed Lewis as a witness. This testimony is uncontradicted.

Based on the above testimony, the hearing examiner and the Board concluded that the respondent discriminatorily discharged Lewis because of his union activities. The Board discredited the testimony of both Caputo and Boer as not being impartial, and thereby rejected major portions of their testimony. Because of variations and some inconsistencies between the testimony of Boer and Orr, the Board discredited both their stories concerning the manner in which Boer became acquainted with the anonymous letter and the way in which he transmitted his alleged request to replace Lewis to Orr. The Board credited all the testimony of Lewis, and believed his assertion that he never drank on the job. The hearing examiner suggested to Lewis that the reason he would sometimes have liquor on his breath was "Because Lewis was accustomed not to eat breakfast in the morning but to take only a cup of coffee, it is quite likely that the odor on his breath was from liquor consumed the night before." The Board rejected the respondent's explanation for Lewis' discharge. It was further held that even if "Boer had acted on such a flimsy excuse as the anonymous letter and had for that reason requested a replacement for Lewis, I (hearing examiner) should find it difficult to believe that a reasonable employer would have used that as an excuse for discharging Lewis." The Board placed great emphasis on the fact

that Lewis was discharged two days before he was scheduled to testify at a hearing concerning the respondent's refusal to bargain, where it might be expected that Lewis would testify unfavorably against respondent. The Board found that the respondent committed an unfair labor practice because of its discriminatory discharge of Lewis, in violation of Sections 158(a) (3) and (1), Title 29, U.S.C., and ordered him reinstated with back pay.

■ Section 158(a) (3), Title 29, U.S.C., makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." It is unlawful for an employer to discharge an employee if the primary motivation therefore is his membership in or his activities on behalf of a labor organization. Subject to this qualification, the National Labor Relations Act does not restrict an employer's right to discharge his employees. National Labor Relations Board v. Waterman S. S. Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704, rehearing den., 309 U.S. 696, 60 S.Ct. 611, 84 L.Ed. 1036; National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.St. 490, 83 L.Ed. 627; N.L.R.B. v. Challenge-Cook Brothers of Ohio, Inc., 374 F.2d 147, decided March 2, 1967 (C.A. 6); N.L.R.B. v. Adkins Transfer Co., 226 F.2d 324 (C.A. 6). An employer has the right to discharge an employee for any reason, whether it is just or not, and whether it is reasonable or not, as long as the discharge is not in retaliation for union activities or support. Fort Smith Broadcasting Company v. N.L.R.B., 341 F.2d 874 (C.A. 8); N.L.R.B. v. Florida Steel Corp. (Tampa Forge & Iron Div.), 308 F.2d 931 (C.A. 5); N.L.R.B. v. Adkins Transfer Co., supra; National Labor Rel. Bd. v. Standard Coil Products Co., 224 F.2d 465, 51 A.L.R.2d 1268 (C.A. 1), cert. den. 350 U.S. 902, 76 S.Ct. 180, 100 L.Ed. 792. The Board cannot substitute its judgment for that of the employer as to what constitutes reasonable grounds for discharge. National Labor Rel. Bd. v. Wagner Iron Works, Etc., 220 F.2d 126 (C.A. 7), cert. den. 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850. The question of proper discipline of an employee is a matter left to the discretion of the employer. National Labor Relations Board v. Mylan-Sparta Co., 166 F.2d 485 (C.A. 6); National Labor Relations Bd. v. Montgomery Ward & Co., 157 F.2d 486 (C.A. 8).

■ Membership in a union does not immunize employees against discharge for reasons other than union hostility. Wellington Mill Division, West Point Mfg. Co. v. N.L.R.B., 330 F.2d 579 (C.A. 4), cert. den., 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88; N.L.R.B. v. Florida Steel Corp. (Tampa Forge & Iron Div.), supra; Ore-Ida Potato Products, Inc. v. N.L.R.B., 284 F.2d 542 (C.A. 9); N.L.R.B. v. Birmingham Publishing Company, 262 F.2d 2 (C.A. 5); National Labor Relations Bd. v. J. H. Rutter-Rex Mfg. Co., 229 F.2d 816 (C.A. 5); National Labor Relations Board v. Mylan-Sparta Co., supra. An employer's stated or avowed opposition to a labor union is not, in itself, sufficient evidence to sustain a finding that his employees were discharged because of discrimination against the union. N.L.R.B. v. Redwing Carriers, Inc., 284 F.2d 397 (C.A. 5); National Labor Relations Board v. Newton Company, 236 F.2d 438 (C.A. 5).

■ The question of whether an employee is discharged because of his union affiliations and activities is essentially a question of fact. The findings of the Board are conclusive if supported by substantial evidence considering the record as a whole. Section 160(e), Title 29, U.S.C. The general rule is that where the credibility of a witness is in issue, the matter is for the determination of the trial examiner and the Board. N.L.R.B. v. Challenge-Cook Brothers of Ohio, Inc., supra; Keener Rubber, Inc. v. N.L.R.B., supra; N.L.R.B. v. Herman Bros. Pet Supply, Inc., supra; N.L.R.B. v. Bendix Corporation (Research Lab. Div.), supra. However, it has been held that where, under circumstances similar

to those present in this case, the findings of the trial examiner and the Board are based primarily on the uncorroborated testimony of the party who stands to benefit from an award of reinstatement and back pay, such testimony may not constitute substantial evidence. N.L.R.B. v. Elias Brothers Big Boy, Inc., 327 F.2d 421 (C.A. 6); N.L.R.B. v. Barberton Plastics Products, Inc., 354 F.2d 66 (C.A. 6).

■ A review of the evidence indicated that respondent had ample reason to discharge both Leeth and Lewis. Leeth had been in the employ of respondent for only ten months. One of respondent's clients requested that he be transferred because they did not like his work. He was suspended from Metropolitan Hospital after respondent was notified that his work was not satisfactory. The hearing examiner believed that some of the complaints from Metropolitan were exaggerations and others fabricated, but nevertheless the fact remains that there were substantiated complaints about the quality of Leeth's work. It is uncontradicted that respondent was requested by Mt. Carmel Hospital to replace Leeth with another guard because Leeth was not working out well. The examiner believed that a suspension rather than a discharge would have been a more appropriate remedy. But as noted earlier, the matter of employee discipline is left to the discretion of management and is not a proper concern of the Board. Believing that Orr never told Leeth that he was discharged for almost two weeks, and disbelieving Orr's contrary testimony, the Board concluded that Leeth was discharged in an attempt to dissipate the strength of the Union. Aside from respondent's hostility to the Union, there is no evidence to support such an explanation. Leeth's minimal union activities were limited to presenting two grievances with the assistance of Union committeemen. We are convinced and hold that the Board's finding that respondent discharged Leeth because of his union activities is not supported by substantial evidence. On the contrary there is substantial evidence that he was discharged for cause.

■ In the course of rejecting the respondent's explanation of the discharge of Lewis, the hearing examiner and the Board discredited the testimony of Ogle, Orr, Caputo and Boer, and credited the uncorroborated testimony of Lewis. The hearing examiner recognized the fact that Lewis "would, at times, appear at work with the odor of liquor on his breath." It is undisputed that Lewis was transferred from two previous assignments for this very reason. Even though there are inconsistencies between the testimony of Orr, and Caputo and Boer, the fact remains that respondent knew of the hospital's concern and Lewis' past history. Yet the hearing examiner rejected this explanation and based Lewis' discharge on respondent's retaliation for the damaging testimony which Ogle assumed Lewis would present at a Board hearing concerning the charge that respondent refused to bargain with the Union which was the subject of the 8(a) (5) and (1) violations discussed herein. This was an unreasonable inference in view of the fact that no evidence was presented to contradict Ogle's and Orr's assertions that they had no knowledge that Lewis had been subpoenaed to testify. The hearing examiner's explanation of and excuse for the presence of liquor on Lewis' breath is in the realm of pure speculation. The hearing examiner further found that even if respondent discharged Lewis on the basis of the anonymous letter, this was not a reasonable basis for discharge. The Board is limited to determining whether there was a discriminatory motive behind an employee's discharge, and not whether the Board agrees with the employer's reasons or even finds them reasonable. On this state of the record, it must be concluded that the respondent discharged Lewis because Lewis had a history of repeatedly showing up to work with the odor of liquor on his breath. The record lacks substantial evidence to sustain the Board's contrary conclusion. Union animus cannot supply the necessary discriminatory

motive with which to find an unfair labor practice.

The Board's order is enforced except as to the portions ordering the reinstatement of Leeth and Lewis with back pay.