### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### AAA ELECTRIC, INC. and Simms Electric Co., Respondents.

### No. 71-2028.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 5, 1972.

Decided Jan. 12, 1973.

As Modified April 20, 1973.

---

Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., John J. A. Reynold, Jr., Director, Region 26, N. L. R. B., Memphis, Tenn., Allen H. Feld-

man, Washington, D. C., for petitioner; Robert Giannasi, Washington, D. C., on brief.

Stephen C. Small, Nashville, Tenn., for AAA Electric, Inc.; William N. Ozier, Nashville, Tenn., for Simms Electric Co.; John D. Whalley, Barksdale, Whalley, Leaver, Gilbert & Frank, Nashville, Tenn., on brief for AAA Electric, Inc.; Russell F. Morris, Jr., Nashville, Tenn., on brief for Simms Electric Co.; Bass, Berry & Simms, Nashville, Tenn., of counsel.

Before PHILLIPS, Chief Judge, and McCREE and MILLER, Circuit Judges.

PHILLIPS, Chief Judge.

The National Labor Relations Board, acting pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), seeks enforcement of its order issued against AAA Electric Inc. and Simms Electric Co. published at 190 N. L.R.B. No. 23. The Board found that respondent companies violated §§ 8(a)(1), 8(a)(3) and 8(a)(5) of the Act.

Wiley Simms founded both AAA and Simms Electric, which are electrical contracting firms. He began the former in 1960 and created the latter in 1967 for the purpose of performing the labor on contracts successfully bid by the former. Until September 2, 1969, Simms' wife was president of Simms Electric. The president of AAA was Walter Sears, who also served as vice president of Simms Electric. Wiley Simms has always been the sole stockholder of AAA and, until September 2, 1969, was the majority stockholder of Simms Electric. Simms and AAA during the relevant period shared office space and clerical help. At least 75 per cent of the work done by Simms Electric was on jobs contracted by AAA. On September 2, 1969,

Wiley Simms sold his interest in Simms Electric to Sears and the company has since become known as Simms-Sears Electric Co. This new company has not accepted any work from AAA since its creation.

In early 1969, Sears and Simms approached the representatives of Local 835, International Brotherhood of Electric Workers, of Jackson, Tennessee, for the purpose of obtaining a work force for a job that AAA was bidding on in the Jackson area. There was an oral agreement that the Union would refer qualified employees to the employer if the latter was successful in its bid for the Southwest Electric Co-Op job in four surrounding counties. AAA was successful in its bid for the job and was awarded the contract. Work began around the beginning of April 1969. The initial work was done by Simms Electric, although there was no written subcontract between AAA and Simms and no notification of AAA's bonding company or the Southwest Electric Co-Op. The company agreed to comply with the Southeastern Line Constructor's Agreement, which was one of two alternatively applicable local collective bargaining agreements.

In early summer, Wiley Simms became concerned that there was not enough progress being made on the job. He spent the greater part of four to six weeks at the job site in Jackson in an attempt to discover the difficulty. He discussed the slowness at least once with the job superintendent and told him that if the job did not get moving, he, Simms, would have to do something about it. On August 1, there was a realignment of personnel, including the creation of a general foreman's position and the elevation of an employee to the position of foreman. Several employees were fired or asked to quit. These actions, while designed to improve the

progress with which the project was moving proved to be unsuccessful.

During the month of August, the job superintendent told several of the workers that if there was no real progress made on the job the employer would have to go non-union. He told at least one of the employees that the job "wouldn't be built under organized labor if things didn't pick up." Simms testified before the trial examiner that during this period many of the men were simply standing around and were purposely "slow walking" the project in an attempt, according to Simms, to stretch out the term of employment.

After repeated attempts to prod the men into action, Simms sold his interest in Simms Electric on September 2, 1969, and made the decision to put AAA in charge of the Southwest Co-Op job in place of Simms Electric. On September 5 the Simms Electric employees were laid off for lack of work and AAA assembled a new construction force to complete the Southwest job. The new force included at least some of the members of the Simms Electric work force, including the job superintendent. AAA refused to accept any referrals from the Union and ceased making payments to the union benefit fund which, apparently, Simms Electric had done as part of the original referral agreement with the Union. While paying the workers comparable wages to those set out in the collective bargaining agreement which Simms voluntarily had followed, AAA was not abiding by any collective agreement.

The record shows that in the five months from the start of the contract until September 5, 21.9 miles of the work had been completed by Simms Electric workers with the expenditure of 873 man-hours per mile. In the six month period from September 5 to March 13, 1970, through the more diffi-cult winter season, the AAA crew completed 65.9 miles of the job with the expenditure of 459 man-hours per mile.

On December 22, 1969, unfair labor practice charges were filed against AAA and Simms Electric for violation of §§ 8(a)(1), 8(a)(3) and 8(a)(5) of the Act. The case was heard by Bernard Seff, trial examiner, in Jackson on March 31, and April 1, 1970. He found there was no violation of §§ 8(a)(1) or 8(a)(3), but did find a violation of § 8(a)(5) for refusing to continue to bargain with the IBEW and the cessation of payments to the union benefit fund. The Trial Examiner did not pass on the claim that the two employers constitute a single enterprise because he felt that whether or not they were, they were both guilty of § 8(a)(5) violations.

As to the § 8(a)(1) and § 8(a)(3) charges, the trial examiner found that the job superintendent did not discriminate against any of the Simms Electric employees because of their union membership. He found that the dismissals of the work force by Simms were for "perfectly valid economic reasons."

The Board on May 4, 1971, affirmed and adopted the Trial Examiner's ruling on the § 8(a)(5) charge, but refused to adopt his findings on the other two charges and ruled that there had been violations of §§ 8(a)(1) and 8(a)(3). Concluding that the Trial Examiner's finding of economically valid layoffs was based on conclusory testimony of the superintendent that there was a deliberate slowdown by the workers, the Board also found that the threat of the superintendent that the job would "go non-union" if the work pace was not increased was a violation of § 8(a)(1). The Board concluded that the mass layoff of the Simms employees was an effort by the respondents to avoid dealing with the Union. It concluded, in finding the § 8(a)(3) violation:

"[W]e are unable to adopt the principle that an employer can get rid of a union by the simple expedient of firing all its employees and hiring others to take their jobs."

■ In enforcement proceedings, this court's scope of review is limited to the consideration of whether there is substantial evidence on the record considered as a whole. 29 U.S.C. § 160(f). It should be noted that in cases like the one at bar, where the Trial Examiner and the Board differ in their conclusions, this court must examine the evidence with greater care. N. L. R. B. v. Bin-Dicator Co., 356 F.2d 210, 215 (6th Cir. 1966); Burke Golf Equipment Corp. v. N. L. R. B., 284 F.2d 943, 944 (6th Cir. 1960).

In reviewing the record before the Trial Examiner and the Board, this court finds that the Board's decision is not supported by substantial evidence on the record considered as a whole. It should be noted that this court is compelled to view, not only the evidence supporting the Board's conclusion, but also the "body of evidence opposed to the Board's view." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S. Ct. 456, 465, 95 L.Ed. 456 (1951).

The Board found a § 8(a)(1) violation in the threatening of the superintendent that if work did not proceed better the job would be going non-union. The § 8(a)(3) was found in the actual dismissal.

■ This court holds that, based upon the record in this case, no such violations occurred. The two sections involved, of course, are designed to protect workers in their union activity and membership. N. L. R. B. v. Ogle Protection Service, 375 F.2d 497, 505 (6th Cir. 1967), cert. denied, 389 U.S. 843, 88 S.

Ct. 84, 19 L.Ed.2d 108; N. L. R. B. v. Challenge-Cook Brothers, 374 F.2d 147, 151 (6th Cir. 1967). These sections do not prevent employers from making terminations for valid economic reasons or from threatening so to do. The record supports the decision of the Trial Examiner, who, with the benefit of the demeanor and personal testimony of the witnesses before him, determined that there was no anti-union animus in the threat and the eventual dismissal. The undisputed evidence in the record shows that the AAA crew did almost twice as much work under more difficult working conditions than the Simms crew. This is evidence that there was, indeed, a slowdown by the first crew and that this was the basis for the dismissal. The superintendent as well as the owner of the company were both members of the IBEW. The company, at about the same time of this incident, was cooperating with the IBEW at another job nearby. An employer does not lose the right, under the National Labor Relations Act, to dismiss his employees because they are not performing properly. Colonial Corp. of America v. N. L. R. B., 427 F.2d 302 (6th Cir. 1970); Barnwell Garment Co. v. N. L. R. B., 398 F.2d 777, 778 (6th Cir. 1968).

We find no evidence whatsoever to support the finding of the Board that the company was motivated by a desire to avoid working with the Union. No evidence is cited by the Board to support this conclusion. To the contrary, there is abundant evidence that there was a slowdown on the job which was causing delay in the completion of the work.

The Board apparently based its conclusion on two major points: (1) the statements of the superintendent and owner were merely conclusory and (2) if the Simms crew had been so inefficient then AAA would not have hired back some of them on the new crew. As to the first point, even if the testimony of

the owner and the superintendent was conclusory, there is no contradictory testimony available in the record to show anti-union animus. As to the second point, the mere fact that some of the Simms employees were rehired by AAA does not establish that the first crew was not inefficient. There is ample evidence that the first crew was considerably less efficient than the second.

■ We now come to the asserted violation of § 8(a)(5). The valid economic termination of all of the employees resulted in the loss of majority status on the part of the Union. There is no duty to bargain with a union under these circumstances. Accordingly, we find that the Company's withdrawal of recognition from the Union did not constitute a violation of § 8(a)(5) of the Act.

Enforcement denied.