S.I.U. DE PUERTO RICO ET AL., demandantes y recurrentes, *v.* OTIS ELEVATOR COMPANY, demandada y recurrida.

*Número:* R-76-231 *Resuelto:* 10 de marzo de 1977

"(a) . . . . . . . .

". . . . . . . .

*López-Lay & Vizcarra,* abogados de los recurrentes; *Nigaglioni, Palou & Ledesma,* abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Este recurso exige que analicemos la validez de un Laudo obrero-patronal impugnado por fundamentos de índole constitucional.

Santos Ernesto Rosario—mecánico durante 19 años de la Otis Elevator y miembro y delegado electo de la Unión S.I.U. de P.R.—fue despedido el 23 de noviembre de 1973. Sometida tal acción a arbitraje, se determinó que durante su incumbencia como delegado, desarrolló una actitud de grave hostilidad contra el personal de supervisión y ejecutivo de la compañía, hostigando e incitando infundadamente a sus compañeros a objetar los planes de ésta y a formular querellas, en su mayoría originadas o sugeridas por él, creando un clima de desasosiego en toda la empresa, al extremo de manifestar enérgicamente que ciertos supervisores eran unos ineptos y deberían ser reemplazados, incurriendo en prácticas de insubordinación. En una ocasión, de una jornada semanal de 40 horas, abandonó el trabajo sin permiso durante 32 horas. A juicio del árbitro, se estableció, además, que Rosario había sido un buen empleado y mecánico; que su actitud negativa comenzó y se manifestó al ser nombrado delegado de la unión; que en su expediente personal no constaba ninguna reprimenda; y que antes del despido no se le había llamado la atención por escrito aunque sí verbalmente. Basado en los anteriores hechos el árbitro concluyó que si bien el despido no se debió a causas gremiales ni fue caprichoso, como sanción fue injustificado, modificando la misma en el sentido de disponer que fuera reintegrado al trabajo, sin paga atrasada, *y ello sujeto a que fuera sustituido como delegado.*

No conforme,(¹) Rosario y la Unión instaron demanda denominada "Acción de Inconstitucionalidad de Laudo" alegando violaciones a los Arts. 12, 16 y 17 de la Carta de Dere-

---

(¹)Antes de acudir al foro judicial Rosario radicó un cargo de práctica ilícita ante la Junta Nacional alegando despido por causas gremiales. 29 U.S.C.A. 158(a)(3). La Junta pospuso su decisión hasta que la controversia fuese adjudicada a través del procedimiento de arbitraje, y después de revisar el laudo, concluyó que el despido no se debió a causas prohibidas en la Ley Nacional de Relaciones del Trabajo sino debido a las numerosas ocasiones en que abandonó el trabajo para atender querellas. Apelada la decisión al "General Counsel" en Washington, éste confirmó dicha decisión.

chos de la Constitución del Estado Libre Asociado e inexistencia de prueba para sostener el Laudo. El Tribunal Superior declaró sin lugar la misma.

En revisión discuten los siguientes errores:

"Erró el Tribunal a quó [*sic*] al adoptar las determinaciones de hecho del árbitro no estando estas sostenidas sustancialmente en el récord en su totalidad, con lo cual se violó el debido procedimiento de ley al condicionar la resposesión [*sic*] de Rosario.

Erró el Honorable Tribunal a quó [*sic*] al sostener un laudo contrario a derecho ya que viola la Constitución del Estado Libre Asociado de Puerto Rico, con lo que se viola implícitamente también la política pública. Dicho laudo viola los Artículos 12, 17 y 19 de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico al disponer como condición para la reposesión [*sic*] del recurrente la sustitución como delegado de la Unión."

■ Los procedimientos de arbitraje y laudos emitidos en el campo laboral gozan ante los tribunales de justicia de una especial deferencia por constituir el trámite ideal para resolver disputas obrero-patronales de modo rápido, cómodo, menos costoso y técnico. La experiencia en Puerto Rico en las últimas décadas ha demostrado que el arbitraje es un mecanismo que tiende a mantener la estabilidad y paz industrial, propósitos cardinales en nuestras leyes laborales.

■ Esta deferencia brindada y la confianza que los laudos representan, han servido como fundamentos para el desarrollo de nuestra doctrina de que serán respetados a menos que se demuestre la existencia de fraude, conducta impropia del árbitro, falta del debido proceso de ley, ausencia de jurisdicción, omisión de resolver todas las cuestiones en disputa, o que sea contrario a la política pública. *J.R.T.* v. *Otis Elevator Co.*, 105 D.P.R. 195 (1976); *Colón Molinary* v. *A.A.A.*, 103 D.P.R. 143 (1974) y casos allí citados. En consecuencia, como regla general el foro judicial no está accesible para que se reproduzcan y diluciden las controversias adjudicadas en un Laudo.

Como excepción, presente en el caso de autos, los tribunales pueden intervenir y revisar si el convenio o acuerdo de sumisión, según sea el caso, consigna expresamente que el Laudo sea resuelto conforme a derecho, y ello con referencia al derecho aplicado. *Colón Molinary* v. *A.A.A.*, supra; *J.R.T.* v. *Cooperativa Cafeteros*, 89 D.P.R. 498 (1963).

■ Del análisis de los autos y de la Exposición Narrativa de la Prueba, se desprende que la ilustrada sala sentenciadora resolvió correctamente que los procedimientos seguidos durante el arbitraje fueron justos y razonables, ajustándose a las normas que nutren el debido proceso de ley, a saber: notificación y conocimiento de los cargos, vista y oportunidad de someter evidencia. Abona a esta conclusión, la existencia de evidencia sustancial que sostiene las determinaciones de hecho formuladas por el árbitro. (2)

---

(2) En amparo de tales determinaciones de hecho, el récord refleja prueba sobre los siguientes extremos: que las relaciones obrero-patronales en la empresa fueron catalogadas como inquietantes por el Gerente General Martin S. Gouyd, en ocasión de éste llegar a Puerto Rico; que había muchos casos en arbitraje; que Rosario le comunicó a Gouyd que nunca habría paz industrial a menos que accediera a sus demandas; que Rosario le expresó a De Santiago que si suspendía algún empleado iba a haber *guerra*; que a tales efectos llevaría mil casos a arbitraje; que De Santiago estimó el concepto *guerra* como que Rosario habría de imposibilitarle a la compañía el realizar normalmente las labores que hasta entonces se estaban realizando; que con posterioridad a una suspensión de empleados, Rosario comenzó a formular una serie de demandas y a poner reparos a prácticas establecidas de la compañía tales como: el despido de varios supervisores; llamar a algunos supervisores *ineptos;* demandar que los empleados se personasen a las oficinas todas las mañanas—antes de comenzar las labores —y todas las tardes—al salir—con el objeto de que se marcara en un reloj una tarjeta sobre horas de entrada y salida; indujo a los mecánicos a no trabajar horas extras, sujeto a la compensación adicional como había sido la práctica; indujo a los empleados a no aceptar los turnos irregulares; formuló objeciones a los itinerarios de trabajo negándose a fundamentarlas; reclamó para todos los empleados el pago de la hora de almuerzo (12:00 M. a 1:00 P.M.), no obstante no fueran trabajadas; reclamó el pago de una mesada para todos los empleados que habían sido suspendidos por un período de tiempo en exceso de un (1) año; incitó a los mecánicos a que abandonaran la práctica de llevar a sus hogares los cargadores de los radios y a no utilizar los vehículos personales para atender llamadas, ello contrario a la práctica previamente establecida; amenazó continuamente con

■ Es principio establecido que no es motivo para revisar, cambiar, modificar o variar un laudo y sus determinaciones de hecho, la sola alegación de apreciación y evaluación errónea de la evidencia. De igual modo, los tribunales no deben sustituir el criterio del árbitro, aun bajo la hipótesis de que hubiesen provisto un remedio distinto de haberse sometido la controversia al foro judicial. Ambos principios, a la luz de la prueba desfilada, nos mueven a concluir que las determinaciones de hecho consignadas en el Laudo son correctas. El primer error no fue cometido.

Resta considerar el señalamiento en el segundo error, a saber, que el Laudo es contrario a derecho por violar la Constitución y la política pública. Con tal fin es menester dejar sentado que este error lo elaboran los recurrentes básicamente sobre la tesis de que el árbitro concluyó que el despido fue "injustificado".

Aun cuando tal expresión se hizo constar en la parte dispositiva del Laudo, un examen detenido de todas las determinaciones contenidas y expuestas en dicha decisión demuestra que tal conclusión no tiene apoyo en la prueba y que resulta incompatible con la misma. (³)

---

parar la compañía; e indujo a los mecánicos con experiencia a que se negaran auxiliar a los mecánicos recien contratados por la recurrida.

Obviamente, esta conducta como delegado, unida a la desplegada como empleado—negándose en una ocasión a ejercitar funciones asignadas de *trouble shooter* o *call back* y el tomar tiempo considerable de su jornada laboral para tramitar quejas y agravios—trascienden los límites de la tolerancia que se espera en el ámbito sindical.

(³) "La prueba demuestra que durante este período de tiempo defendió los derechos de sus representados con un celo desmedido y en ocasiones no esperaba que le trajeran las querellas; él las iniciaba a nombre de los empleados. Demostró un grado tal de obstinación y aferramiento que no hacía viable la solución amistosa de la querella, razón por la cual muchas de éstas fueron sometidas a arbitraje. . . . El delegado, señor Santos E. Rosario, llegó al extremo de manifestar abiertamente que el Arbitro que emitió una decisión desfavorable a la Unión se había equivocado, 'que eso había que cambiarlo'. Continuó activamente el *'dale que dale'* entre la matrícula fomentando una situación general de desasosiego contra la Compañía. La gerencia en cambio, nunca se negó a dialogar ni a negociar con

En consecuencia, no podemos convenir con la proposición de los recurrentes de que el despido "no estuvo justificado".

Aclarado el anterior extremo, veamos el Convenio Colectivo. Conforme su Art. XV la cláusula pertinente dispone:

el delegado. Todo esto está patente en el caso de instancia. *No obstante, es meridianamente claro que el despido del querellante no se debió a una actitud antigremial de parte de la Compañía. Lo cierto es que en una situación como la que aquí se describe procedía la sustitución del delegado.* El querellante llegó al extremo de manifestar enérgicamente que los supervisores de la Compañía eran ineptos y que deberían ser relevados. No concebimos un grado de hostilidad y hostigamiento mayor de parte de un delegado frente a los supervisores de una Compañía. Por otra parte, los supervisores que prestaron declaración en el presente caso, manifestaron francamente que el Sr. Santos Ernesto Rosario era un mecánico competente e hicieron demostraciones de aprecio personal hacia Rosario.

"Es bien sabido que el Presidente de una Unión, o el delegado, no están inmunes a las acciones disciplinarias en general, ni al despido, como resultado de su proceder equivocado. No pueden ausentarse sin permiso del sitio de trabajo, so color de estar tramitando asuntos de la Unión. Esto ocurrió en el caso de instancia hasta el punto de que durante una semana en particular el señor Rosario abandonó el trabajo por un total de treinta y dos horas en una semana de cuarenta horas. No obstante, no se le llamó la atención por escrito. Ni se impuso una sanción disciplinaria de suspensión temporera, para respaldar la acción final de despido, de ser necesario recurrir a ese extremo. Se le llamó la atención verbalmente. . . .

*"Por otra parte, estamos convencidos de que el despido del querellante no fue caprichoso ni festinado.* Confrontado con el proceder militante, hostil y controversial del delegado general, la Gerencia se reunió con altos oficiales de la Unión, con el propósito de lograr que el querellante modificara su actitud. El resultado fue negativo. La actitud del querellante no cambió. La Unión tampoco trató de hacer que el querellante cambiara o modificara su proceder. La situación creada por el delegado se agravó. Este se mostró recalcitrante. Indujo a sus representados a desobedecer las órdenes y a no seguir los procedimientos establecidos por la Compañía, algunos de los cuales eran de larga duración. *El caso del delegado se convirtió prácticamente en uno de insubordinación."*

Luego de un análisis de toda la prueba, el árbitro formuló las siguientes conclusiones:

"El proceder del querellante [Rosario] justifica que se le imponga una sanción disciplinaria, razón por la cual *la acción tomada por la Compañía no fue caprichosa ni arbitraria, ni festinada y está totalmente exenta de discrimen gremial. Sin embargo, un tratamiento remedial escalonado pudo haber sido aplicado como solución intermedia al caso, antes del despido, lo cual no se hizo.* Procedía, por lo menos, que se diera al señor Rosario una o varias advertencias escritas, lo cual tampoco se hizo. Además, se trata de un trabajador diestro que desempeñó en forma excelente sus funciones

"(4) El árbitro tendrá jurisdicción en los casos en que la Unión alegue que un empleado o grupo de empleados ha(n) sido suspendido(s) o despedido(s) sin justa causa, y si en tal caso el árbitro determinare a base de la preponderancia de la prueba sometida que el empleado o grupo de empleados fue(ron) suspendido(s) o despedido(s) *sin justa causa, el árbitro podrá ordenar a la Compañía que tome aquella acción afirmativa,* incluyendo la reposición del empleado o empleados afectados, con o sin paga atrasada." Pág. 39. (Bastardillas nuestras.)

█ Su lectura pone de manifiesto dos aspectos de importancia. Primero, que el concepto preciso envuelto es "justa causa", sinónimo de "causa" o "causa apropiada". En palabras de un entendido en la materia este concepto se ha definido como ". . . excluyendo el despido por mero capricho o antojo . . . [pero incluyendo como razones] . . . el derecho a despedir por robo, ausencias o tardanzas repetidas, destrucción de la propiedad de la compañía, reyertas, y situaciones análogas." Benewitz, *Discharge, Arbitration and the Quantum of Proof,* 28 Arb. J. 96 (1973).

██ Y en segundo lugar, la cláusula posee un lenguaje, que por su contenido, tanto expresa como implícitamente, confiere al árbitro el poder de ordenar que se adopten aquellas acciones afirmativas apropiadas que las circunstancias exijan en los casos de despido o suspensión. Ello sigue la trayectoria de nuestros pronunciamientos en *Colón Molinary,* de

de mecánico por 19 años, aproximadamente, con un alto grado de lealtad a la Compañía. *En consecuencia, procede que modifiquemos la acción de despido que es objeto del presente arbitraje. Procede, además, que el querellante sea sustituído en la posición de delegado general."*

Y es la parte dispositiva del laudo que inexplicablemente consigna:

*"El despido del Sr. Santos Ernesto Rosario, no estuvo justificado.* Sin embargo, su proceder amerita que se le imponga una sanción disciplinaria severa. Se ordena la reposesión [*sic*] del empleado a su posición de mecánico, sin derecho a recibir paga retroactiva de clase alguna, con la condición de que el señor Santos Ernesto Rosario sea sustituído como delegado de la Unión en la planta. La reposesión [*sic*] será efectiva tres (3) días después de que la Unión notifique por escrito a la compañía la sustitución del señor Rosario como delegado." (Bastardillas nuestras.)

que los árbitros están facultados para disponer remedios que sean consustanciales y afines a los propósitos de la ley y el convenio. Reafirmamos la autoridad de un árbitro de variar una sanción disciplinaria si considera que la misma es muy severa y drástica.

¿Es contrario a la Constitución y a la política pública el Laudo que nos ocupa?

██ Para formular la contestación adecuada debemos tener presente que la condición de delegado de una unión, *per se*, no da ni quita ningún derecho. Así, se ha resuelto que los delegados también pueden ser despedidos: *Firestone Tire & Rubber Co.* v. *N.L.R.B.*, 539 F.2d 1335 (1976); *N.L.R.B.* v. *Ogle Protection Service, Inc.*, 375 F.2d 497 (1967) y *Corriveau & Routhier Cement Block, Inc.* v. *N.L.R.B.* 410 F.2d 347 (1969). Y a nivel de arbitraje: *Int'l Telephone & Telegraph Corp.*, 54 L.A. 1110 (1970); y *McDonell Douglas Corp.*, 53 L.A. 646 (1969). Véase además: Leahy, William H., *Arbitration and Insubordination of Union Stewards*, 27 Arb. J. 18–28 (1972).

En el caso de autos, hemos visto cómo la prueba y conclusiones del árbitro establecieron que al asumir su rol de delegado, Rosario trascendió los límites de lo permisible incurriendo en acciones que justificaban su despido.

██ El árbitro, con el propósito de atenuar dicha sanción, la modificó imponiendo como condición de que renunciara al cargo de delegado. Varios casos anteriores de arbitraje, giran sobre el punto en controversia. En *Sinclair Refining Co.*, 6 L.A. 965 (1974), con relación al despido de Reed, el árbitro determinó que "éste era muy buen empleado hasta que fue electo y nombrado delegado siendo la causa de sus problemas sus actuaciones indebidas y el celo extremo en la implementación del convenio." Consideró, que habiendo sido buen empleado y nunca antes penalizado, el despido era una medida extrema, disponiendo que fuera repuesto a su trabajo bajo condición de que dejara su puesto de delegado. En

*Bauman Bros. Furniture Mfg. Co.*, 10 L.A. 78 (1968), el delegado de la unión fue despedido por conducta impropia, encontrando el árbitro que su falta de control, temperamento y ausencia de tacto no eran causa suficiente y justificada para sostener el despido, decretando no obstante, que dejara su puesto de delegado por un período de dos años como condición a su reintegro. Y en *Locheed Aircraft Line, Inc.*, 32 L.A. 690 (1959), el delegado de la unión fue despedido por insubordinación. El árbitro determinó que su posición y falta de control eran algunas de las causas principales de su conducta, sustituyendo el despido por una suspensión cualificado su reintegro a que renunciase a su puesto sindical y no actuase en capacidad alguna como representante de la unión por un período de un año.

Ante la alternativa de mantener el despido—y como consecuencia Rosario perder, no ya su derecho a continuar en el cargo de delegado de la unión, sino todos los derechos constitucionales, legales y contractuales dimanantes de su condición de empleado—inspirado en estos casos y en consideración a la clara relación causal existente entre el puesto de delegado de la unión y la conducta negativa y carácter de Rosario (de extremada importancia para el adecuado desempeño de sus responsabilidades como delegado) el árbitro optó por modificar la sanción de despido disponiendo su reposición sin paga retroactiva pero descualificándolo para tal posición. Si válidamente podía sostener el despido, no vemos razón para que no pudiera decretar tal remedio.

 El derecho constitucional consagrado en el Art. II, Sec. 17 de la Carta de Derechos, preceptuando que los trabajadores podrán organizarse y negociar colectivamente con sus patronos ". . . por mediación de representantes de su propia y libre selección", y otros no son absolutos. "[L]os derechos individuales tienen que entenderse dentro del cuadro general de la sociedad con arreglo a las limitaciones inherentes a la vida en común." 4 *Diario de Sesiones de la Conven-*

*ción Constituyente de Puerto Rico,* 2576 (1961); *Pérez* v. *Autoridad Fuentes Fluviales,* 87 D.P.R. 118, 123–124 (1963). El Poder Legislativo puede imponer condiciones necesarias para el ejercicio razonable de tales derechos. De igual modo, en el ejercicio de la función judicial o en un procedimiento de arbitraje, los jueces y árbitros están en la obligación de resolver y reconocer los derechos de las partes, incluyendo el delimitar los mismos.[4] La política pública constitucional no es ". . . fomentar huelgas o disensiones en las relaciones obrero-patronales. Antes por el contrario, el propósito es facilitar esas relaciones dentro de un clima de respeto mutuo y reconocimiento recíproco de su esencial interdependencia productiva." *Diario de Sesiones de la Convención Constituyente de Puerto Rico, op. cit.,* 2575. En las circunstancias específicas del caso, el haberse condicionado la reposición de Rosario a que renunciara su puesto de delegado de la unión, es una medida válida, razonable y necesaria en la consecución de los fines enunciados.

---

[4] En el caso de *Alexander* v. *Gardner-Denver,* 415 U.S. 36 (1974), citado por los recurrentes, en síntesis, el Tribunal Supremo federal resuelve que los derechos garantizados por la Ley Sobre Derechos Civiles de 1964 no forman parte de un convenio colectivo laboral, y por ende, aun cuando una Unión puede renunciar ciertos derechos estatutarios relacionados en el convenio, no puede abdicar los derechos de los empleados bajo el Título VII de la referida ley. Tales empleados, individualmente son acreedores a un juicio ante el foro judicial (*de novo*) en virtud de la mencionada ley que no puede ser restringido por haberse sometido a arbitraje una reclamación por alegado discrimen según un Convenio Colectivo.

El examen crítico de la decisión de *Alexander* y los distintos comentaristas sobre la materia nos convencen, que no es aplicable al de autos pues ". . . su alcance está limitado a disputas laborales que alegadamente conllevan violaciones a la Ley Sobre Derechos Civiles de 1964, y aun en dicha área, el impacto actual de la decisión sobre el proceso de arbitraje es incierto." Cohen & Eaby, *The Gardner-Denver Decision and Labor Arbitration,* 27-1 Lab. L. J. 23 (Jan. 1976); Siter, *The Gardner-Denver Decision: Does it Put Arbitration in a Bind?* 25 Lab. L. J. 708–717 (Nov. 1974); Yarowsky, J., *Judicial Deference to Arbitral Determinations: Continuing Problems of Power and Finality,* 23-5 U.C.L.A. L. Rev. 936–962 (1976). No estamos ante un caso de despido por discrimen racial, político o laboral.

*La sentencia será confirmada.*

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Rigau no intervinieron.